*In the Matter Of:*

# DOUGLAS J. GOSSER

-vs-

# HENRY COUNTY SHERIFF'S DEPARTMENT, ET AL.

## TARA WESTERMEN, R.N., VOL. I

## August 01, 2018



**CONNOR REPORTING**
111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

```
 1      would talk to each other about days that needed

 2      covered, and we didn't -- whoever needed to work

 3      the weekend, we would have to fix it.  Get it

 4      covered.

 5  Q   What type of hours was Ms. Lewark working in

 6      2016, if you recall?

 7  A   I don't recall.

 8  Q   Were you both there at the same time during the

 9      week?

10  A   I'm sure there were times when we overlapped.  I

11      know I'm sure there was, but not on a normal

12      basis.

13  Q   Was the schedule set up to have medical

14      employees such as yourself at the jail seven

15      days a week?

16  A   Yes.

17  Q   So there would be someone there each day?

18  A   Yes.

19  Q   What length of time would they be there each

20      day?

21  A   I can't answer that.  We were contracted hours.

22      It wasn't 24-hour care.

23  Q   It was just based on the hours of the contract?

24  A   Right.

25  Q   And how were you made aware of what the hours of
```

```
 1         the contract were?

 2    A    I knew how many hours in the week we had to do.

 3    Q    How many hours?  Do you recall?

 4    A    72 at that time.

 5    Q    Was that in 2016?

 6    A    It stayed about 72 the whole time I worked

 7         there.

 8    Q    Have you ever been provided a copy of the

 9         contract between Henry County and QCC in terms

10         of the medical care?

11    A    No.

12    Q    Have you ever reviewed any terms, or has anyone

13         made you aware of what those requirements are?

14    A    No.

15    Q    Were you aware that the contract between Henry

16         County and QCC required up to 60 hours of

17         nursing per week?

18    A    No.

19    Q    So in terms of the time that you've been with

20         QCC and while you were at Henry County, were you

21         ever provided any documents that indicated that

22         you were to provide 72 hours of care per week?

23    A    I was told.  I didn't have documents.

24    Q    Who told you that?

25    A    Our nurse manager.
```



```
 1    Q    And would there be times where she wasn't there

 2         and you were there?

 3    A    Correct.

 4    Q    Would there be times where both of you weren't

 5         there?

 6    A    Correct.

 7    Q    I know you indicated you weren't aware when

 8         Mr. Stephenson started working with QCC, but are

 9         you aware of any type of schedule that he kept

10         in terms of Henry County while you were at Henry

11         County?

12    A    We had a provider that came once a week.  I

13         mean, it didn't matter who it was.  There was a

14         jail provider there once a week.

15    Q    Okay.  And would that be Mr. Stephenson?

16    A    He was there, a provider there.

17    Q    What other provider would you have seen in 2016?

18    A    Benjamin Loveridge was there in 2016.  We had

19         another provider, but I'm not sure of the time

20         frame.

21    Q    If you can recall, and I know we're talking

22         two-plus years later, but in 2016, how often

23         would you see Mr. Stephenson at the jail?

24    A    Once a week if he came when I was there.

25    Q    Were there times or weeks where you didn't see
```

```
 1          Stephanie and Sandy were both there.  So we went

 2          around with them to learn the jail, learn where

 3          everything was.  We had a protocol that we used

 4          so --

 5     Q    What type of protocols?

 6     A    For any and everything that was medical.

 7     Q    Okay.  Well, you say anything and everything.

 8          Were there specific things that it dealt with?

 9     A    Yeah.  It's a protocol book.  So if somebody

10          complained of something.  They put health

11          request in.  We were seeing them.  We would have

12          to contact the doctor, but we had protocols that

13          we could pull.  Jail staff had the same

14          protocols.  What they are, they are sheets and

15          you go through them.  And it's like they ask

16          question for question and what information that

17          you need.  That way you have everything right

18          there in front of you before you were to contact

19          a physician or anybody.

20     Q    Okay.  Would that deal with specific conditions

21          or symptoms, things of that nature?

22     A    Yes.

23     Q    There was a series of questions that you could

24          run through with the inmate or the detainee to

25          determine what the next steps were or whether
```

```
 1        have a doctor, would have to send so many of his

 2        charts for a doctor to review and sign off on,

 3        but I don't remember who that was.

 4   Q    To your knowledge, was that a random selection

 5        of charts or was that, you know, a specific

 6        number of charts on a -- for a particular period

 7        of time?

 8   A    I have no idea.

 9   Q    Okay.

10   A    I usually just use the charts that he'd done

11        that week.

12   Q    In terms of you, we talked about you being on

13        call when you weren't at Henry County.  Were you

14        expected to be on call 24 hours a day?

15   A    It wasn't just me specifically.  We had a call

16        list.  So they had different contact numbers for

17        medical, and you would just call the first

18        number.  And if you didn't get a response, you

19        would call the next number.

20   Q    Was that call list maintained in writing?

21   A    It was printed out.

22   Q    Printed.  Would it include other staff from

23        other jails?

24   A    It included usually nurses at the jail, the

25        regional nurse managers, mental health contact
```

49

```
 1   A    Okay.

 2   Q    Hopefully that might clarify a few things.

 3             In terms of your daily activities at the

 4        jail, depending on the number of hours that you

 5        were working at the jail on a given day, would

 6        you have interaction with the inmates and

 7        detainees at the jail throughout the day?

 8   A    Yes.

 9   Q    And would those interactions occur during the

10        time you were doing med pass?

11   A    Mostly.   I would -- there were inmate workers

12        that would be in the hallway, people that were

13        coming in and out going to court.   If I pull

14        people out for health request or physicals.

15   Q    Would you speak with the inmates during those

16        periods?

17   A    Yes.

18   Q    Would you speak with the inmates even if you

19        were not passing meds or addressing a sick call

20        request?

21   A    I'm sure there were times that we did, yes.

22   Q    Would you make documentation of any of the

23        discussions that you had?

24   A    Not every conversation.

25   Q    But if anything significant came up?
```

Tara Westermen, R.N., Vol. I
72                              August 01, 2018

72

```
 1        first paragraph of page 100, could you read that

 2        for me.   Out loud.

 3   A    Starting with "These protocols"?

 4   Q    Yes, ma'am.

 5   A    "These protocols are designed to assist the

 6        staff in the gathering of information to be

 7        communicated to the medical staff.   The

 8        protocols are not intended to establish standard

 9        of medical care and are not standing orders.

10        Actual medical orders must be approved by a

11        physician and/or psychologist."

12   Q    And in terms of your understanding relative to

13        the medical care that Quality Correctional Care

14        provided at the jail, who was the responsible

15        individual for that purpose?

16   A    One more time.

17   Q    Who was the responsible individual for purposes

18        of providing medical care at the jail? Henry

19        County?

20   A    I don't think I understand your question.

21   Q    Was Quality Correctional Care the sole medical

22        provider at the jail, to your knowledge?

23   A    Yes.

24   Q    And this would apply in 2016?

25   A    Yes.
```

```
 1   Q   And who supervised the provision of that medical

 2       care at the jail?

 3   A   The doctors?

 4   Q   I'm asking do you know?

 5   A   Any care that the nurses gave, the doctors

 6       oversee.

 7   Q   Do you know of any involvement that the sheriff

 8       would have had? the sheriff of Henry County

 9       would have had in the provision of medical care

10       at the jail?

11   A   No idea.  I mean, anything at the jails are

12       through the sheriff.

13   Q   So when you would arrive at work and something

14       had occurred or something significant had come

15       up, the correctional officers would pull the

16       protocols from this particular document;

17       correct?

18   A   When we weren't there?

19   Q   Yes, ma'am.

20   A   Yes.

21   Q   They would go through the list of questions

22       under each condition?

23   A   Correct.

24   Q   And in terms of the types of conditions we

25       talked about, it covers a varying degree of
```

1   Q   Are you aware of whether any progress notes were

2       completed relative to this sick call request?

3   A   There's a progress note for the 554.

4   Q   So is that the note you're referring to?

5   A   Yes.

6   Q   It says "medical progress note," but it's a

7       little bit more form-based as opposed to

8       handwritten?

9   A   Right.  This has the complaint.  Any information

10      that we need on here is on here.

11          So I was talking about earlier where it

12      says "the findings, objective, subjective."  If

13      we get orders from the doctor or whoever.

14  Q   Is that your handwriting on 554?

15  A   It is.

16  Q   That's your signature?

17  A   It is.

18  Q   It's dated 2-23-16?

19  A   Yes.

20  Q   Based on this, based on 554, was he given the

21      Librium and Prozac?

22  A   He was not given Librium.

23  Q   Is there a reason why?

24  A   He was not having alcohol withdrawal.

25  Q   But he was given 40 mls of Prozac?

113

```
 1   A   No.

 2   Q   Were you aware that Mr. Gosser was sent to the

 3       ER on February 27 for injuries that he had

 4       sustained in one of the blocks?

 5   A   Not when it happened.

 6   Q   When did you become aware of that?

 7   A   I know from paperwork.  I don't have an exact

 8       day.

 9   Q   Do you recall any discussions with Mr. Gosser

10       about setting up a time to meet with

11       Mr. Stephenson when he came to the jail sometime

12       after February 27?

13   A   I do not remember.

14   Q   How would an inmate go about setting up a time

15       to meet with the PA or even the physician when

16       they were at the jail?  Is it based on whatever

17       that schedule is, or is that a specific request

18       they have to make?

19   A   No.  So if somebody is sent to the ER, they have

20       injuries or -- if somebody's sent besides for

21       medical clearance, then they do follow-ups with

22       the jail provider.

23   Q   The inmate does?

24   A   Yes.

25   Q   But did you have any involvement in arranging
```



```
 1         results of those X-rays?

 2    A    I do remember him contacting me with the results

 3         of X-rays, yes.

 4    Q    And do you recall having Officer Lecher send

 5         those to you?  Those results?

 6    A    I remember calling Chris to tell him to talk to

 7         him about the results and call the jail back.

 8    Q    Well, if Officer Lecher --

 9    A    They don't usually send them to us.

10    Q    Well, I'll ask my follow-up question.

11              If Officer Lecher has indicated, during the

12         course of investigation into the death of Brian

13         Gosser at the Henry County Jail, that you asked

14         him to send you the results of those X-rays or

15         pictures of those X-rays so you could see them,

16         is that an incorrect statement?

17    A    That could have been very possible.

18    Q    But you don't recall that happening?

19    A    I don't remember that happening, but it's

20         possible that could have happened.  It's not

21         something that we would normally do, no.

22    Q    When an inmate is sent out to the ER, and they

23         are returned to the jail, what information does

24         QCC medical staff receive relative to that

25         discharge?
```

116

1    A    The discharge papers that you have on the 540.

2    Q    On 540?

3    A    The QCC 540.  Exhibit 27.

4    Q    So this would be a document that you would

5         receive from the hospital at the time that they

6         are returned to the jail?

7    A    Yeah.  I mean, this is not the exact document,

8         but that's the discharge.

9    Q    Something similar to this?

10   A    Correct.

11   Q    Are there times where you have to await

12        information from the hospital when an inmate is

13        returned to the jail?

14   A    They never send us paperwork pertaining -- even

15        if we send them there, they will never give us

16        any paperwork.  We have to request all the

17        notes, all the records, everything.

18   Q    How do you make those requests?

19   A    We fax over -- we have to have --

20            The patient has to sign a release of

21        information -- we call them ROIs -- and we have

22        to fax it to medical records.  So pertaining to

23        the hospital, we send it to the medical records

24        at Henry County hospital.  And they have so many

25        days they can send the results back over.

118

```
 1        determination to send an inmate to the ER?

 2   A    I would send somebody without calling a doctor

 3        if I felt like they needed to go.

 4   Q    Would you have follow-up to get approval --

 5   A    I don't have to have approval to send somebody

 6        to the ER, no.  We would contact the doctor.

 7   Q    At any point in time between February 2016 and

 8        March 3rd of 2016, were you provided or was

 9        QCC provided, to your knowledge, information

10        relating to the injuries that Mr. Gosser

11        sustained on or around 2-26 at the jail?

12   A    From memory, I do not remember getting any -- I

13        don't remember.  That's what I'm trying to tell

14        you.  I do not remember anything besides what

15        I'm sitting here reading.

16             I can read this and tell you that I know

17        that they sent this discharge paper, the 565.

18        When he came back to the jail, he was cleared to

19        come back on the 27th.  It says what the

20        hospital recommended for the injuries that he

21        sustained.  And I know, because it said at the

22        top "contacted ER waiting for ER physician

23        notes" they were contacted, and we're waiting

24        for them to come back.

25   Q    But in terms of that contact that you're
```



121

1  Q  I'll ask you a better question.  If you look at

2     page 560, which I'll represent appears to be a

3     fax from Henry County hospital dated March 4?

4  A  Correct.

5  Q  And is that directed to your attention?

6  A  Yes.

7  Q  Is that 521-3746, is that the fax number?

8  A  According to the sheet, yes.

9  Q  Is that the fax number at the jail?

10 A  I have no idea what the fax number at the jail

11    is off the top of my head.

12 Q  I just was curious.

13       Are these the physician notes that you were

14    referring to in your request on February 29?

15 A  Yes.

16 Q  And you didn't get those apparently until

17    March 4?

18 A  Correct.

19 Q  Were you aware that Mr. Gosser had died at that

20    point in time?  He had passed away?

21 A  I know it was on that date, yes.

22       Anytime we fax or send requests for medical

23    records, they have up to so many business days

24    before they have to respond to them or send them

25    back over.

123

```
 1        retain or somebody had obtained this discharge

 2        report from the medical box as of February 29?

 3    A   Yes.

 4    Q   And this discharge report with this outline, the

 5        particular injuries that Brian Gosser had

 6        sustained and had been evaluated and diagnosed

 7        at the hospital during his visit on February 27?

 8    A   Yes.

 9    Q   All right.  So he had, based on this particular

10        document, the discharge report, closed fracture,

11        multiple ribs, fracture of his nasal bones,

12        closed fracture of facial bones, a concussion,

13        and apparently experienced a loss of

14        consciousness -- correct? -- based on this

15        document?

16    A   Right.

17    Q   When these discharge reports are received by

18        QCC, are they reviewed?

19    A   Yes.  By the provider.

20    Q   If you turn to 568, it's a discussion of

21        follow-up care.  It indicates "The patient needs

22        to be monitored for the next 24 hours for signs

23        of head injury, including but not limited to

24        somnolence, confusion, worsening headache,

25        vomiting.  He should be rechecked by a physician
```



125

| | | |
|---|---|---|
| 1 | A | It says "Inmate returned from ER.  Multiple rib |
| 2 | | fractures and -- I cannot read that -- fractured |
| 3 | | something, complaint of pain, PA notified, |
| 4 | | telephone order, ibuprofen, 800 milligrams." |
| 5 | | That stands for one tab twice a day. |
| 6 | Q | Does that indicate to you that Ms. Lewark saw |
| 7 | | Mr. Gosser on February 28? |
| 8 | A | Yes. |
| 9 | Q | Would it surprise you to know that Ms. Lewark |
| 10 | | was not scheduled nor did she work on |
| 11 | | February 28, 2016, at the Henry County Jail? |
| 12 | A | I do not know her date of work. |
| 13 | Q | Based on the time records that have been |
| 14 | | produced today, it would appear the last day you |
| 15 | | worked prior to February 27 was February 26, |
| 16 | | 2016, at the Henry County Jail, and you got off |
| 17 | | at 11:30 a.m.? |
| 18 | A | (Nods head.) |
| 19 | | Is that a Thursday? |
| 20 | Q | Take a look. |
| 21 | A | It sounds possible. |
| 22 | Q | It would be a Friday. |
| 23 | A | Okay. |
| 24 | Q | And that you were back in the Henry County Jail |
| 25 | | on February 29 at 7:15 a.m -- |

127

```
 1          February 28.  I apologize.  But you have no idea

 2          what she did?

 3    A     Yeah.  I mean, I'm not -- I wasn't there.  I

 4          can't say what she did or did not do.

 5    Q     And the only progress note for February 28th

 6          just indicates that he was returned from the ER

 7          with multiple rib fractures and a fractured

 8          septum and advised to take ibuprofen of 800

 9          milligrams?

10    A     That's what it says.

11    Q     Now, looking at 574.

12    A     Okay.

13    Q     This is a progress note.  This appears to be

14          Mr. Stephenson's handwriting and signature.

15               Would you agree with that?

16    A     Yes.

17    Q     And this indicates that Mr. Stephenson saw Brian

18          at some point on March 2nd, 2016?

19    A     Correct.

20    Q     At that point, he had been back at the jail

21          since 3:51 on February 27, 2016.  So roughly

22          three days later, he's seen by the PA?

23    A     Correct.

24    Q     Based on the jail's records, it looks like

25          Mr. Gosser saw Chris Stephenson at 6:27 on
```



Tara Westermen, R.N., Vol. I
131                          August 01, 2018

131

```
 1        officers that they should contact you about

 2        X-ray results?

 3   A    At the time that she done that?

 4   Q    Yes, ma'am.

 5   A    No.

 6   Q    Had you evaluated or seen Mr. Gosser that

 7        particular day?

 8   A    I had done meds that day.  I seen him.  I passed

 9        meds that morning.

10   Q    Anything significant about Mr. Gosser stand out

11        from that day?

12   A    He wasn't being very pleasant.  He --

13             I can't remember if he told me or an

14        officer that he had thrown up or had spit up.  I

15        went back to check, I remember that.  And he had

16        a cup.  And he had spit into the cup, like just

17        literally spit in a cup.  And I told him if he

18        didn't feel good, I'm like "Why are you up

19        jumping around?  If you don't feel good, why

20        don't you lay down"?

21   Q    When you say "up and jumping around," what was

22        he doing when you saw him?

23   A    Like up moving around and just wouldn't sit

24        down.  He was in a small cell.

25   Q    He was in a different cell at that point;
```

132

```
 1        correct?

 2    A   Yeah.

 3    Q   It was a significantly smaller cell than where

 4        he was; correct?

 5    A   Yes.

 6    Q   And did he appear to be in any pain?

 7    A   No.

 8    Q   Were you aware at that point in time what his

 9        injuries actually were?

10    A   I'm sure -- I'm sure at some point with him

11        coming back from the hospital, that yeah, I

12        found out.

13    Q   You don't recall when that was?

14    A   I don't recall when that was.  I know that that

15        day when I was there and did meds, he did not

16        look like anything was wrong with him.

17    Q   How was his coloring?  Do you recall?

18    A   Nothing was abnormal to me.

19    Q   Did you take any vitals at that point?

20    A   No, I did not.

21    Q   And you say he said he was spitting up or

22        vomiting -- is that what you said? -- into a

23        cup?

24    A   Right.  He told me he had spit in a cup.  Like

25        just regular spit; like not vomiting.  It was
```

133

```
 1        not vomit.  There was nothing abnormal about it.
 2    Q   Did you tell him that you needed to actually see
 3        it?  You actually had to see him vomit?
 4    A   Yeah.  There was a lot of times we would tell
 5        people if they were getting sick, "If you're
 6        getting sick, let us see so we can see that
 7        you're getting sick, not just saying that you're
 8        getting sick."  It's not that he's lying but --
 9    Q   Was there any other interaction at that
10        particular time or that day that you can recall
11        with Mr. Gosser?
12    A   Not that I remember.
13    Q   Now, in terms of med pass, that occurs --
14        what? -- in the morning and then one in the
15        evening --
16    A   Yes.
17    Q   -- usually?
18            And are there particular designated times
19        where that occurs?
20    A   No.  We just have an a.m. and a p.m.
21    Q   In terms of the ibuprofen that Mr. Gosser had
22        been prescribed by Mr. Stephenson, along with it
23        looks like Prednisone and Tylenol, a thousand
24        milligrams, would those also be distributed at
25        those points in time?
```



Tara Westermen, R.N., Vol. I
August 01, 2018
134

134

```
 1   A   The Prednisone was only once a day, but the
 2       other ones were twice a day, yes.
 3   Q   If I referred you to the last two pages of this
 4       med pack document, that's the distribution of
 5       medication relative to Mr. Gosser; correct?
 6   A   Right.  We call it a MAR sheet.
 7   Q   A MAR sheet?  Medication administration record?
 8   A   Yes.
 9   Q   If we're just looking at the -- I guess it's
10       583.  You got the ibuprofen 800 milligrams, one
11       tab twice daily.  Is that your handwriting; is
12       that someone else's?
13   A   The second one?
14   Q   Yeah.
15   A   Or the third one?
16   Q   Well, any of them.
17   A   I think the second one's mine and the first one.
18   Q   But in terms of the February 28 entry, is that
19       what that is?  Ibuprofen 800 milligrams, one tab
20       twice daily.  It shows the a.m./p.m.
21       distribution?
22   A   On 584?
23   Q   583 and 584.
24   A   February is 584, though, right?  Yes.
25   Q   Yeah.
```

Tara Westermen, R.N., Vol. I
August 01, 2018

137

137

| | | |
|---|---|---|
| 1 | Q | Obviously, there's not 31 hours in a day; |
| 2 | | there's 31 days potentially in a month. |
| 3 | A | Right. |
| 4 | Q | You've got the 28th here. |
| 5 | A | Yes. |
| 6 | Q | This is on 584 for February? |
| 7 | A | Correct. |
| 8 | Q | Then you've got February 29.  And these initials |
| 9 | | here show that he was distributed the ibuprofen? |
| 10 | A | Right. |
| 11 | Q | And fluoxetine? |
| 12 | A | Yes. |
| 13 | Q | And the same on 583, which is March; correct? |
| 14 | A | Right.  He was given meds every day from |
| 15 | | February 25th to March 3rd. |
| 16 | Q | Well, I don't see an entry for the p.m. |
| 17 | | distribution on March 2nd of ibuprofen. |
| 18 | A | Umm -- |
| 19 | Q | Or March 1st.  I'm sorry. |
| 20 | A | So the second entry for ibuprofen, it was |
| 21 | | discontinued.  So that order, you can't see it |
| 22 | | on here because it's probably highlighted out, |
| 23 | | which is what we do to discontinue stuff.  Where |
| 24 | | it says "order," that says "order changed." |
| 25 | | So he got that ibuprofen on March 1st.  But |

140

```
 1        do meds and stuff, if you have two people, two

 2        inmates from each block tell us something or ask

 3        for something, they are always told they have to

 4        fill out a health request.  Obviously if they're

 5        having chest pains or something like that, then

 6        no.  We don't say, "Oh, no, fill a paper out."

 7        No, that's what we see them for.

 8            That's the whole reason why we have this

 9        procedure for us.  I can't remember 20 different

10        things that people tell me when I'm doing meds.

11        So they fill the health request out.  That way

12        we can see them for them to initiate their care.

13   BY MR. HALBERT:

14   Q    You're aware at that point in time that

15        Mr. Gosser had been at the ER that prior

16        weekend; correct?

17   A    Yeah.

18   Q    You testified today that you saw the discharge

19        summary at some point and were aware what his

20        injuries were at that point in time; correct?

21   A    Yes.

22   Q    And would you consider that to be a serious

23        medical problem; that he was having or at least

24        had the injury that he had?

25   A    If he was vomiting and having issues, yes.  But
```



Tara Westermen, R.N., Vol. I
August 01, 2018

141

141

```
 1       when I seen him, there was absolutely nothing

 2       wrong with him.  He was up and wouldn't sit down

 3       and was moving around the cell.  He wasn't being

 4       very pleasant.  Not -- he wasn't telling me,

 5       like, "I'm sick.  I don't feel good."  He was,

 6       like, "I threw up.  You have to see me."  It

 7       wasn't "I'm vomiting, help me, come and check

 8       me," or anything like that.

 9    Q  So you're --

10    A  He wasn't having shortness of breath.  He wasn't

11       having any problems.  Anytime I've ever had

12       somebody that's had any medical issues, I'm not

13       just going to leave them somewhere, leave them

14       in a cell if something's wrong with them.  I'm

15       going to pull them out and check them.

16    Q  So you questioned the legitimacy of what he was

17       saying?

18    A  I did not see him throw up nor had anybody else.

19    Q  How many inmates have you treated at the Henry

20       County Jail who have had broken ribs?

21    A  I have treated people at the jail with broken

22       ribs multiple times.

23    Q  With multiple broken ribs?

24    A  I have.

25    Q  In those instances, have they indicated that
```

143

```
 1        mean, not just medical though.  Even jail staff,
 2        they do rounds.  They are supposed to do hourly
 3        rounds and everything else.
 4   Q    Are jail staff trained to --
 5   A    I'm not --
 6   Q    Hold on.  I'm not finished yet.
 7             Are they trained, to your knowledge, to be
 8        able to recognize serious medical issues related
 9        to shortness of breath, the pain, and the
10        injuries that Mr. Gosser had sustained?  Can
11        they actually recognize the symptoms and be able
12        to tell you what you need to hear?
13   A    There have been many times they had recognized
14        shortness of breath, multiple different symptoms
15        of different issues, and they have contacted
16        medical.  Or the patient would have complained,
17        and they would have pulled the protocol.
18   Q    But my question is that they're not trained
19        medical professionals, are they?
20   A    They have certain medical training that they are
21        required to have.
22   Q    But are they trained and licensed medical
23        professionals?
24   A    They are trained in medical first aid, CPR,
25        different things.  They're not licensed, no.
```

Tara Westermen, R.N., Vol. I
August 01, 2018

144

144

```
 1   Q   Are they trained to administer emergency medical
 2       treatment to inmates?
 3   A   They are trained if they feel it is an emergency
 4       and there's an issue, they send people to the ER
 5       and then contact medical.
 6   Q   But QCC, yourself, Ms. Lewark, Mr. Stephenson,
 7       you're the medical professionals that are
 8       assigned to the jail?
 9   A   When I seen him, there was nothing wrong with
10       him.  He didn't even complain of anything else.
11       He wasn't complaining of anything else.  He was
12       not complaining of having breathing issues.  He
13       never complained of not being able to breathe or
14       having chest pains or anything else whatsoever.
15           The only thing that he ever said was that
16       he threw up.  He didn't even say "I'm throwing
17       up."  It was that he threw up.
18   Q   He was clearly having some issues because he did
19       complain.  He complained on March 3rd.
20   A   I'm not saying he didn't have issues.  I'm
21       saying when I seen him, he was not having
22       issues.  What happened after that and
23       transpired, I was not there and I cannot speak
24       to that.
25   Q   You didn't take any additional steps to figure
```

149

```
 1          remember one time, like I remember seeing him

 2          with a black eye, but I don't remember any -- I

 3          don't even remember what Brian looks like.

 4     Q    If you would look at page 580, which is a

 5          radiology report.

 6               Do you recall receiving this or seeing this

 7          document that night? on March 3, 2016?

 8     A    I'm sure that this is the results that I got

 9          from Clark Lecher.

10     Q    The ones you asked him to send to you or take a

11          picture of?

12     A    I don't remember asking him, but if I did, it's

13          possible, especially if it had wording that I

14          did not understand over the phone.

15     Q    Do you recall getting this for Mr. Lecher?

16     A    No.  But I remember him calling with results.

17     Q    Okay.  And this radiology report indicates

18          there's a slight infiltrate in the right lung

19          base?

20     A    Yes.

21     Q    What does that mean to you?

22     A    I have no idea.  I'm not a doctor.

23     Q    Did you contact Mr. Stephenson after seeing

24          this?

25     A    I did.
```

150

```
 1   Q    What did Mr. Stephenson tell you?

 2   A    Start him on antibiotic.  He thought he could

 3        possibly have pneumonia, the beginning of

 4        pneumonia.  I called the jail back and told

 5        them.

 6   Q    Were you made aware at any point prior to that

 7        that Mr. Gosser had been vomiting other than

 8        your interaction with him during med pass?

 9   A    No.

10   Q    When was that antibiotic for the pneumonia

11        supposed to start?

12   A    I don't know if we were having them give it that

13        night, which we very possibly could have had

14        them go ahead and start it, or if that's

15        something that we would start the next morning.

16   Q    Do you recall a scrip being provided by

17        Mr. Stephenson on March 3, 2016, for that

18        purpose?

19   A    He told me we write those orders.  We order

20        those meds from the pharmacy.  We actually have

21        pharmacy sheets that we fill.  He doesn't

22        actually write a hard prescription, like a paper

23        that you go to the doctor and get.

24   Q    But your understanding is that that was going to

25        start the next day?
```



153

1    Q    You don't know whether he was working with the

2         Henry County Jail in the early part of 2016, do

3         you?

4    A    I don't.  No.

5    Q    What about Dr. Greg Helwarth?

6    A    Are those from the ER or the jail?

7    Q    The jail.  I'm just asking.

8    A    No.

9    Q    What about a Dr. Pantel?

10   A    That doesn't sound familiar.

11   Q    Those physicians, would they act as supervisors

12        relative to Mr. Stephenson, to your knowledge?

13   A    I have no idea because I don't know who they

14        are.

15   Q    That's fine.

16            Shortly after you got or received or saw

17        the radiology report, the X-ray, you'd spoke to

18        Mr. Stephenson, there was a determination it

19        might be pneumonia?

20   A    Yes.

21   Q    And that he would start on the antibiotic either

22        sometime that night or the next day?

23   A    Right.

24   Q    Did you receive any follow-up communications

25        from Officer Lecher at the jail relative to



154

```
 1        Mr. Gosser?

 2    A   Yeah, he called me back again.

 3            MR. ELBERGER:  We have to take a brief

 4        break shortly.  The food's being brought in.

 5            (A discussion was held off the record.)

 6    BY MR. HALBERT:

 7    Q   So the X-ray report that we just looked at has a

 8        time stamp of 9:20 p.m. on March 3.

 9            Do you recall the time frame after 9:20

10        that you received that call from Officer Lecher?

11    A   I'm guessing as soon as it came in that they

12        called me, but I do have -- I do not remember

13        what time he called me.

14    Q   Was there a follow-up call from Officer Lecher

15        not related to the X-ray but related to

16        Mr. Gosser at the jail?

17    A   Yes.

18    Q   And in terms of when you talked about the X-ray,

19        how long after you talked to Officer Lecher

20        again?

21    A   Shortly.

22    Q   What did he tell you?

23    A   Said he was in the drunk tank.  Maybe -- I know

24        he was in the drunk tank.  Said he was throwing

25        up and he looked bad.  I said, "What do you mean
```



Tara Westermen, R.N., Vol. I
155                      August 01, 2018

155

```
 1        'bad'?"  He said, "Throwing up bad."  I said,

 2        "What do you mean he's 'throwing up bad?'"  He's

 3        like, "He's really throwing up."  I said, "All

 4        right.  We're going to send him.  I'm calling

 5        Chris."

 6             I called Chris.  He didn't answer.  I

 7        called the jail back and told them to send him

 8        immediately.

 9   Q    Did you talk to Stephenson again to let him

10        know?

11   A    I think I called him again or he called me back,

12        and I told him I sent him out.  Or he told me to

13        send him out, and I said I already did.

14   Q    Well, was that the last time you spoke to anyone

15        at the jail relative to Mr. Gosser?

16   A    Yes.

17   Q    Do you recall -- strike that.

18             Page 581.

19   A    Okay.

20   Q    Is that the progress note that you prepared

21        relative to those discussions for the events on

22        March 3?

23   A    Yes.

24   Q    Your progress note indicates that you had

25        obviously spoken to him during the med pass.  He
```

161

```
 1        March 4, 2016?

 2   A    I think I was called to the sheriff's office.

 3   Q    Who called you to the sheriff's office?

 4   A    Very possibly the sheriff.  It's in the same

 5        building.

 6   Q    Do you know what purpose you were called there

 7        for?

 8   A    They -- to tell me that he had passed away.

 9   Q    Do you know who told you that?

10   A    The sheriff.

11   Q    Mr. McCorkle?  Sheriff McCorkle?

12   A    Yes.

13   Q    Is that all he said, or did he say anything

14        else?

15   A    I don't remember.  I remember him telling me

16        that he had passed away.  "Passed away this

17        morning," is what he said.  He told me he had

18        passed.

19   Q    Were you aware that the jail's policies and

20        procedures, in terms of medical care, provided

21        that when inmates returned from the emergency

22        room, that a physician is supposed to see them?

23   A    Follow up with them.

24   Q    Were you aware of that?

25   A    Yeah.
```

 1   Q   Have you ever reviewed a policy of that nature

 2       that states that?

 3   A   No.  But anytime somebody returns from the ER,

 4       we have to send them.  We have the provider

 5       follow up with them.

 6   Q   And they're supposed to review the discharge

 7       paperwork that comes from the ER?

 8   A   Correct.

 9   Q   Did you ever provide the discharge paperwork to

10       Mr. Stephenson and/or the physician assigned to

11       the jail?

12   A   I do not recall.  It would have been in the

13       patient's chart.

14   Q   Are you aware of any particular medical action

15       plan that was implemented as a result of

16       Mr. Gosser's injuries upon his return from the

17       ER on February 27, 2016?

18   A   I don't think so.

19   Q   And I just want to be clear, your testimony

20       today is that you never have reviewed the county

21       jail policies and procedures; correct?

22   A   We give that to them.  It's not something I

23       would sit there and go through, no.

24   Q   Have you ever gone through it?

25   A   Not to my knowledge of ever remembering, no.

1   Q   Would you agree that we have not seen that

2       today?

3   A   I would agree with that.

4   Q   All right.  And in terms of Mr. Stephenson's

5       visit with Mr. Gosser on March 2 of 2016, are

6       you aware of what information he had in his

7       possession relative to the injuries that Brian

8       had?

9   A   Say that one more time with your dates.

10  Q   Sure.  Based on the medical records, Chris

11      Stephenson saw Brian Gosser on March 2 of 2016.

12  A   Okay.

13  Q   We looked at the jail records in terms of the

14      time, so it was around 6:00-something at night.

15          Are you aware of what information

16      Mr. Stephenson had when he conducted that exam?

17  A   Information in his chart besides -- well,

18      according to the dates, obviously anything after

19      that.  In the hospital, he would have had

20      discharge instructions.

21  Q   So it would have included the discharge

22      instructions that we've talked about today?

23  A   Right.  Not the medical notes.

24  Q   Not the medical notes.

25  A   Yes.



179

```
 1    A    No.

 2    Q    Do you have any idea what your obligations are

 3         under it?

 4    A    No.

 5    Q    One of the requirements is that QCC will provide

 6         at least one physician visit per week and a

 7         physician available via telephone or email 24

 8         hours a day, seven days a week.

 9              Who was the M.D. that fulfilled that

10         requirement in 2016?

11    A    There was multiple people there in 2016.  There

12         was some people I was naming earlier:

13         Christopher Stephenson --

14    Q    He's not an M.D.; correct?

15    A    He's a physician assistant.  He's a provider

16         that can still go to the jail.

17    Q    Who was the medical director in 2016?

18    A    I have no idea.

19    Q    Was Chris Stephenson the highest-ranking person

20         at QCC who would visit the Henry County Jail in

21         2016?

22    A    No.  Dr. Loveridge was an M.D. and he visited

23         the jail.

24    Q    How often did he visit?

25    A    They were once a week.
```

182

```
 1   A   Yes.

 2   Q   Did you have any communication with LouAnn

 3       Phares, Brian Gosser's mother, at any time?

 4   A   No.

 5   Q   Did Dennette ever indicate to you that she had?

 6   A   Not to me.

 7   Q   Every time Brian Gosser filled out a sick call

 8       request, or whatever it's called, was he seen by

 9       either you or Dennette or Chris Stephenson?

10   A   He'd be seen by medical, yes.

11   Q   Okay.

12   A   Unless it was the middle of the night.  And

13       that's when jail staff was there, and they would

14       pull the protocols.

15   Q   So his complaints about his dental issues, he

16       admitted to you that he had slipped and hit the

17       shower wall?

18   A   Yeah.  He hit his mouth on the shower.

19   Q   Did he ever change his story and say he was hit

20       in the mouth?

21   A   Not to me.

22   Q   Did you ever treat any other inmates from

23       F block during this period of time who had

24       injuries from fighting with one another?

25   A   I have no idea.
```

Tara Westermen, R.N., Vol. I
183                          August 01, 2018

183

1   Q   Okay.  Did you have any conversation with Brian

2       Gosser about who beat him up in F block?

3   A   I did not.

4   Q   Did he ever indicate to you that he had been hit

5       while in B block?

6   A   One more time.

7   Q   Did he ever tell you he had been struck while he

8       was in B block by an inmate?

9   A   He never told me he was struck at all.

10  Q   Is it correct to say that broken ribs generally

11      do not require any type of treatment?

12  A   That's true.

13  Q   Did Brian Gosser ever tell you that he had been

14      attacked three to four different times and he

15      was just going to take his lickings, but the

16      last time was just too much for him?

17  A   I don't remember him telling me that.  I do

18      remember reading somewhere where he said that.

19  Q   So did you meet with Detective Ed Manning about

20      this?

21  A   Yes.

22  Q   On one occasion or more than one?

23  A   One.

24  Q   Did he just interview you, or did he take a

25      recorded statement or written statement?

185

```
 1              MR. PIERCE:  I know it's been a long day,

 2         so you'll get there.  It's okay.

 3    BY MS. POLLACK:

 4    Q    Okay.  So on March 3rd, the night of March 3rd,

 5         after the X-ray results came in, Clark Lecher

 6         contacted you.  You contacted Chris Stephenson

 7         or you tried to but were unable to?

 8    A    He contacted me.

 9    Q    You reached him and discussed the results?

10    A    Right.

11    Q    At some point you tried to reach him about

12         sending him to the ER and couldn't, so you made

13         the decision to send him?

14    A    Yes.

15    Q    How much later was that after you discussed the

16         X-ray results with him?

17    A    I don't remember.  I don't feel like it was very

18         much longer, but I don't know the time frame.

19    Q    And the second round of discussions took place

20         because Clark Lecher called you and said Gosser

21         was vomiting badly?

22    A    He didn't look good and he was throwing up.  He

23         was throwing up bad.

24    Q    When you made the decision to send him out to

25         the ER, did you have anything in mind that you
```

Tara Westermen, R.N., Vol. I
August 01, 2018

187

187

1        think I may have answered my own question.

2            The handwritten notes at the bottom of

3        QCC 000555, that's Dr. Loveridge?  Is that his

4        handwriting?

5    A   No.  I wrote that.  I signed it.  I wrote it.

6        Chris signed off on it and Dr. Loveridge signed

7        off on it.

8    Q   You said you spoke with inmate.  "No signs or

9        symptoms of infection.  No broken teeth.  Inmate

10       admits hit in mouth.  States "will wait a few

11       days to see if better."

12           Do you recall what he told you about how he

13       became hit in the mouth?

14   A   No.  But that's when he told me he hit his mouth

15       in the shower.

16   Q   Shower wall.  Okay.

17           So he never told you that he had been in an

18       altercation?

19   A   Right.

20   Q   Okay.

21           MS. POLLACK:  All right.  Thank you.  Those

22       are all my questions.

23           MR. PIERCE:  I've got none.  We're leaving

24       it open so --

25           She really has -- I mean, she's got to go

**CONNOR REPORTING**          Connor Reporting          317.236.6022
                              www.connorreporting.com

*In the Matter Of:*

# DOUGLAS J. GOSSER

–vs–

# HENRY COUNTY SHERIFF'S DEPARTMENT, ET AL.

# TARA WESTERMEN, VOL. II

## December 12, 2018



**CONNOR REPORTING**
111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

51

1   Q   Do you remember who any of these officers are?

2   A   He doesn't work there anymore.  He quit before I

3       left.

4   Q   Did any of these problems that you've documented

5       in this email have any effect on the treatment

6       you provided to Brian Gosser?

7   A   No.

8   Q   You said you had trouble getting officers to

9       pass meds and they're under staffed and so busy,

10      that sometimes we wait hours literally to do

11      things.

12          What do you mean by that?

13  A   They literally would be busy, and we would tell

14      them who we needed to see or make them a list.

15      It really just depends.  Sometimes we would ask

16      them if they could get a certain person out, and

17      a lot of the times, they would say we can't.

18      We're too busy right now.  You have to wait

19      until later.  And we literally would wait hours

20      sometimes.

21  Q   So sometimes you'd be at the jail without anyone

22      to see because they didn't have time to bring

23      the inmate to you; is that what you're saying?

24  A   No.  I'm saying like I wasn't to see people

25      because they couldn't go get them.



54

```
 1        from QCC was there; right?

 2   A    Right.

 3   Q    All right.  And then once they went through that

 4        and answered the questions, did that -- what was

 5        the purpose of them going through that and

 6        answering the questions?

 7   A    So they could use those protocols to then call

 8        medical.

 9   Q    To call you.  So they weren't supposed to use

10        those to figure out how to treat the person

11        themselves?

12   A    Right, they called.  But like with anything,

13        even -- I mean we had always something posted

14        that said -- you know, on our call list, that

15        you call the first nurse or -- there's always

16        multiple people that you can call.

17             If you can't reach one, you go to the next.

18        And at the bottom of them, it always say in case

19        of emergency, render care -- you know, use your

20        own decision, render care, and then just contact

21        medical afterward just to notify us.

22   Q    And by render care, do you mean call for

23        outside -- take them outside, or do you expect

24        the jail officers to render care themselves?

25   A    Call an ambulance or send them to the ER.
```



Tara Westermen, Vol. II
56                        December 12, 2018

                                                                        56
1        towards the contract?

2    A   No.

3    Q   Okay.

4    A   Chris's hours did not count into the contract.

5    Q   All right.  So 72 hours was just the nurses?

6    A   Yes.

7    Q   What about when you guys are on call, do those

8        go towards the hours?

9    A   No.

10   Q   So 72 hours of an actual nurse being present at

11       the jail?

12   A   Correct.

13   Q   So Chris's hours -- how many hours did he have

14       to be there, do you know?

15   A   I don't know.

16   Q   But those were on top of the 72?

17   A   I don't know if he was contracted hours.

18   Q   All right.  And then did Sandy have a set

19       schedule that she came by, or a minimum number

20       of times she came by per week or per month?

21   A   I'm not sure.

22   Q   Did you and Denette work the same number of

23       hours?

24   A   No.

25   Q   You worked more?