Lisa Scroggins
February 08, 2019

23

```
 1      is that fairly similar to those type of contracts?
 2   A  The basis of it is similar, but every county has
 3      their own county attorney tweak the document.  So
 4      no two contracts are exactly alike.  Every attorney
 5      who looks at it wants to make a change of some
 6      sort.
 7   Q  Because as far as the overall terms, are they
 8      familiar similar?
 9   A  Yeah.  They've evolved over the years, but yes.
10   Q  And in terms of QCC and its origins went back in
11      mid 2011 --
12   A  Yes.
13   Q  -- was Henry County one of your first batch of
14      jails that you guys signed on with?
15   A  Yeah.  I think they were probably number three or
16      four, maybe five, right in that area.
17   Q  And were you -- at that point were you negotiating
18      with Henry County in terms of formulating this
19      document?
20   A  Yes.
21   Q  All right.  So on page 1 of the document, the
22      contract basically -- it indicates that you have
23      onsite physician medical director coverage to
24      include at least one physician visit per week; do
25      you see that?
```



Connor Reporting
www.connorreporting.com

317.236.6022

```
                                                              27
 1        jails in that area, Tipton County, Jay County, some
 2        of those counties in that area.
 3   Q    And then in terms of the onsite nursing care that's
 4        outlined on Exhibit 2, it states 60 hours.  You
 5        have a nurse administrator that's available for
 6        consult 24 hours per day, seven days a week.  She
 7        can also or he can also make weekly visits.
 8             And then you also have QMA staff that are
 9        responsible for 12 hours of medication, correct?
10   A    Right.
11   Q    So you have a total of 72 hours, 60 for nursing, 12
12        for QMA?
13   A    Yes.
14   Q    Did that change at some point or has that changed
15        since this contract was signed?
16   A    Yes.  It's gone to 80 hours.
17   Q    Now, I've heard reference to 82, I've heard
18        reference to 84.  You just said 80.  So when did
19        that change or when would those changes have been
20        made?
21   A    There's only been one change and it's 80.  We often
22        provide more than we're contracted for, but that's
23        the contract.  That is the -- up to 80 hours is the
24        current amount that's contracted.
25   Q    All right.  And is that in writing?
```



Connor Reporting
www.connorreporting.com

317.236.6022

```
 1   A    No, I don't think so.  I'm sorry, it was just a
 2        budget increase that the former sheriff was able to
 3        obtain.
 4   Q    So it was part of the sheriff's budgeting process,
 5        up to 80 hours?
 6   A    Yes.
 7   Q    But as far as you are aware, as we sit here today,
 8        there has not been a written amendment or addendum
 9        to this particular agreement?
10   A    We provide written addendums, but I don't have a
11        signed copy.  So I don't know if it was ever
12        executed on their end.
13   Q    Are you aware of there being a written addendum
14        that was prepared for Henry County to this
15        agreement?
16   A    No, I'm not.  I'd have to look.
17   Q    Could do you that for me?
18   A    Of course.
19   Q    Thanks.  And get that to Mr. Pierce as soon as
20        possible?
21   A    Sure.
22   Q    Now, the agreement also provides on page 2 that you
23        can use nurse practitioners or PA's --
24   A    Yes.
25   Q    -- in terms of the physician schedule; is that
```



Lisa Scroggins
February 08, 2019

29

```
 1       accurate?
 2   A   That's correct.
 3   Q   So the physician's assistant or the NP could step
 4       into the visit that the physician would normally
 5       have to make under this agreement?
 6   A   Right.
 7   Q   Would that also apply in the context of any
 8       specific directives that would say that an inmate
 9       has to be seen by a physician?
10   A   No.  A mid level can be used and Indiana statute
11       allows for a mid level to be used.
12   Q   So if you receive -- just work with me here.
13   A   Sure.
14   Q   If you receive a specific directive from a hospital
15       or from an emergency room that says that someone
16       returning to the jail has to be seen by a physician
17       with a specific period of time, what would QCC do
18       in those instances?
19   A   There isn't anything QCC could do in those
20       instances because we wouldn't have a physician in
21       there.  So the person -- first of all, that's a
22       very boiler plate response.  I mean that's how the
23       hospital protects themselves.  They say if there's
24       an issue, come back or see a physician, working on
25       the assumption that this person has access to their
```



Connor Reporting
www.connorreporting.com

317.236.6022

```
                                                              30
 1        private physician.
 2             In a jail setting unfortunately, the patient
 3        does not have access to their private physician.
 4        Our physician is only there once a week.  So if
 5        there was a requirement, then the county would have
 6        to transport them back to a physician offsite.
 7   Q    So QCC wouldn't have made arrangements to have a
 8        physician of their own come to see the inmate --
 9   A    No, we would not.
10   Q    -- or the detainee?
11   A    No.  If the sheriff called me and said hey, I'd
12        like to get this done, you bet I'd do everything I
13        could do to get it done.
14   Q    Would they call you or would they call --
15   A    Sheriffs call me a lot.  I'm the point person for
16        sheriffs.
17   Q    Again, you don't have any medical training.  So if
18        a sheriff called you about a specific medical
19        training, would you answer those questions or would
20        you defer that or direct them to someone else?
21   A    I would answer the questions as it related to the
22        business.  I would defer anything related to
23        medical care.
24   Q    Would you also rely upon what the contract said?
25   A    This in my opinion is a minimum standards document.
```



Lisa Scroggins
February 08, 2019
31

```
 1        So I'm going to do what I can for my clients
 2        regardless of -- I'm not going to be limited to
 3        this if there's a way for me to help.
 4            I'm not going to be in business very long if I
 5        go over it all the time, but I'm going to be
 6        accommodating as I can.  I mean we are this -- QCC
 7        is there to help an underserved population.  This
 8        is our goal.  So we're not going to let a document
 9        prevent us from helping someone if we can help
10        them.
11   Q    Is there a provision within this agreement or any
12        agreement that you currently use that allow you to
13        go outside the confines of the agreements you sign
14        with the counties?
15   A    Restate that, please.
16   Q    Sure.  Is there any provision that you're aware of
17        in the Henry County agreement or any of the other
18        jail agreements that you're using that allow QCC to
19        make those decisions to go outside the terms of the
20        contracts that they've signed?
21   A    No.
22   Q    And do you agree as far as the contract that you
23        had with Henry County that was signed back in
24        December of 2011, that it provided for a specific
25        amount of money that was going to be paid to QCC
```



Connor Reporting
www.connorreporting.com

317.236.6022

```
                              Lisa Scroggins
37                           February 08, 2019
                                                                   37
 1              When House Bill 1269 went into effect,
 2       requiring every sheriff to sign inmates up that
 3       have been onsite for 30 days for Medicare or HIP,
 4       we adjusted our services to take that -- our global
 5       approach to getting these patients clean and sober
 6       and healthy and then transitioning them out to
 7       communities so that they can have a risk -- an
 8       opportunity of being a little more successful.  We
 9       will make adjustments accordingly based on what's
10       coming through the pipeline.
11              So as a minimum, I always -- it's a cliche,
12       but we always -- our goal is to under promise and
13       over deliver, so yes.
14   Q   But as far as the services that you provided to the
15       jail, that would also include training to the
16       officers, correct?
17   A   Yes, at the request of the sheriff.
18   Q   And whatever training the sheriff wants is what you
19       can provide?
20   A   Yes.  We're an ILEA certified trainer.
21   Q   What is that acronym?
22   A   Indiana Law Enforcement Academy.  So there are a
23       certain number of hours of training there every
24       correctional officers has to go through every year.
25       So we will provide whatever training.
```



Connor Reporting
www.connorreporting.com

317.236.6022

38

```
 1         We can do med pass, basic, mental health
 2     status exams, suicide prevention.  We can go as far
 3     as CPR, AED, Norcan, do some of the more certified
 4     training.  So we have a variety of trainings that
 5     are available.  And then we put together whatever
 6     training the sheriff asks for.
 7  Q  And if the sheriff doesn't ask for it, you don't
 8     provide it, right?
 9  A  Well, we can't go into their facility and provide
10     training if they don't give us a training venue.
11     So if we -- we always remind everyone every year,
12     don't forget you need to get your annual training
13     in place.  We do that, but there are many counties
14     that the third week of December, they're running
15     around saying we haven't done our training yet this
16     year and we're trying to squeeze it in.
17  Q  Is there any additional cost for that training?
18  A  No, with the exception that if we do CPR training,
19     the county has to buy the CPR certification cards,
20     but that's it.
21  Q  Okay.  And then on page 5 of the agreement, which
22     is Exhibit 2, you have a specific title about
23     management services.
24  A  Uh-huh.
25  Q  And there's a number of bullet points that come
```



Lisa Scroggins
February 08, 2019

50

```
 1         sobriety classes, those kinds of things.  And the
 2         vast majority of people, they either bond out
 3         within hours of coming into jail or they go before
 4         a judge and they get a modification of some sort.
 5   Q     But as far as the hours that QCC provides under
 6         this agreement, it's basically a pot of hours,
 7         right?
 8   A     Yes.
 9   Q     And those hours are -- that's the number of hours
10         you get; there's no -- you don't have a specific
11         assignment where those hours are assigned to a
12         particular day that's Sunday through Saturday,
13         seven days a week, correct?
14   A     No, that is not accurate.  We work with the
15         sheriffs and we ask the sheriffs, you know, you
16         have 80 hours a week, how do you want them covered.
17         Some sheriffs may say I want two people here
18         everyday during the week because court is so busy.
19             Other people might say I want a day shift and
20         an afternoon shift.  Some people may want weekend
21         coverage.  So the sheriffs, they tell me what they
22         want.  They're the client and I do my best job
23         possible to meet their needs.
24   Q     Well, what did Henry County do with their hours?
25   A     I believe they were Monday through Friday and they
```



Connor Reporting
www.connorreporting.com

317.236.6022

54
Lisa Scroggins
February 08, 2019

54

```
 1         teaching the officers the importance of follow
 2         through and listening and those kind of things.
 3   Q     Have you received specific training on delivered
 4         indifference?
 5   A     I've attended classes on delivered indifference,
 6         yes.
 7   Q     What kind of classes?
 8   A     When I worked for Delaware County, Advanced
 9         Correctional Healthcare was our provider, they
10         offered once a year.  I would go to those.  I've
11         been to NCCHC conferences, those kind of things.
12   Q     Advanced Correctional Care, do you know whether
13         they were the prior medical provider for Henry
14         County?
15   A     I believe they were.
16   Q     They were fired, right?
17   A     Yes.  They were -- I brought them into Delaware
18         County when I was there.  That's how I went to
19         their classes.
20   Q     But you never -- you wouldn't say that you
21         specifically came into the jail and served as the
22         instructor on a specific topic?
23   A     No.
24   Q     You actually had other qualified people come in and
25         do those trainings, correct?
```



Connor Reporting
www.connorreporting.com

317.236.6022

```
 1  Q    All right.  And as far as the collaboration between
 2       the physician's assistant and the physician, at
 3       least in terms of what QCC was providing to help
 4       Henry County, then the physician is available to
 5       the PA or to Mr. Stephenson to collaborate on care
 6       that he is providing, correct?
 7  A    Yes.
 8  Q    So if Mr. Stephenson has questions or concerns or
 9       wanted to run a certain type of treatment or
10       condition by the physician, he could call him?
11  A    Yes.
12  Q    Or he could e-mail him?
13  A    Yes.
14  Q    Or he could fax him?
15  A    Yes.
16  Q    To your knowledge, does Mr. Stephenson provide
17       services as a PA outside of QCC?
18  A    Yes.
19  Q    And do you know where he does provide those
20       services?
21  A    Southway Urgent Care in Muncie.
22  Q    Do you know how much time or how many hours he
23       works in that capacity?
24  A    I do not.
25  Q    If you look at Sections 2.2 of the agreement,
```



| | | |
|---|---|---|
| 1 | Q | And Dr. Emerson appears to have signed off on this? |
| 2 | A | Yes. |
| 3 | Q | All right.  So you're basically crafting a policy pursuant to NCCHC standards -- |
| 5 | A | Yes. |
| 6 | Q | -- letting the jail know hey, you have to provide access? |
| 8 | A | Right. |
| 9 | Q | But would that also be in your opinion somewhere also a policy of QCC in order to ensure that the proper services are being provided to the inmates? |
| 12 | A | Well, certainly we want to give proper services.  But, again, we can't offer any care until we're informed that there needs to be care, and that is done through a request for medical treatment. |
| 16 | | So until we are notified that there's a situation, because we're not back in the blocks, we are available when we're there to help anybody who needs help. |
| 20 | Q | And you get that notification through sick call -- |
| 21 | A | Yes. |
| 22 | Q | -- or a completion of a sick call request? |
| 23 | A | Yes.  Or an officer, if an officer sees someone that needs help or if our nursing staff notices something at med pass or med line that maybe needs |



87

Lisa Scroggins
February 08, 2019

87

```
 1   Q     It talks about having the jail staff immediately
 2         notifying the medical provider if there's a patient
 3         that's sent out for inpatient care, correct?
 4   A     Yes.
 5   Q     Now, in terms of notification of QCC as the
 6         healthcare provider, to your knowledge based on
 7         policies and procedures or protocols or standards,
 8         was it a requirement that correctional officers or
 9         jail staff contact the medical provider at QCC
10         before sending an inmate or detainee out?
11   A     No.  Our protocol book on the very front of cover
12         says we want you to communicate with us, but in the
13         event of a life threatening emergency, render aid,
14         call 911 and then notify us after the fact.
15             We just want to know when someone goes out.
16         If we can know beforehand, terrific.  If they're
17         doing CPR, they're not going to stop and call us.
18         They're going to call 911.
19   Q     QCC, they provide medical care?
20   A     Yes.
21   Q     They're medically qualified to do what they do;
22         jail officers are not, right?
23   A     Correct.
24   Q     But regardless of that, would you still say that
25         jail officers are expected to use common sense?
```



Connor Reporting
www.connorreporting.com

317.236.6022