UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DOUGLAS J. GOSSER,<br>as Personal Representative<br>OF THE ESTATE OF BRIAN<br>LEE GOSSER,<br><br>             Plaintiff,<br><br>   v.<br><br>HENRY COUNTY SHERIFF'S DEPARTMENT,<br>RICHARD A. MCCORKLE, individually and in<br>his official capacity as Sheriff of Henry County;<br>and BRENT GRIDER, individually and in his<br>official capacity as Jail Commander of the Henry<br>County Jail, OFFICER ROBERT HUXHOLD,<br>OFFICER TERESA WEESNER,<br>OFFICER CLARK LECHER, individually and in<br>their official capacities as Correctional Officers,<br>QUALITY CORRECTIONAL CARE, LLC,<br>CHRISTOPHER STEPHENSON, P.A.,<br>TARA WESTERMAN, R.N., and DENETTE<br>LEWARK, R.N.,<br><br>             Defendants.<br><br>RICHARD A. MCCORKLE, in his official<br>capacity as Sheriff of Henry County,<br><br>             Defendant/Cross-Claimant<br><br>   v.<br><br>QUALITY CORRECTIONAL CARE, LLC,<br><br>             Defendant/Cross-Clam Defendant. | CASE NO. 1:17-cv-03257-TWP-MPB<br><br><br>QUALITY CORRECTIONAL CARE, LLC,<br><br>      Defendant/Cross-Claimant,<br><br>   v.<br><br>RICHARD A. MCCORKLE, in his<br>capacity as Sheriff of Henry County,<br><br>      Defendant/Cross-Claim Defendant. |

1

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS QUALITY CORRECTIONAL CARE, LLC, CHRISTOPHER STEPHENSON, P.A., TARA WESTERMEN, R.N., AND DENNETTE LEWARK, R.N.**

Defendants, Quality Correctional Care, L.L.C. (hereinafter "QCC"), Christopher Stephenson, P.A. (hereinafter "Stephenson"), Tara Westermen, R.N. (hereinafter "Westermen")[1], and Dennette Lewark, R.N. (hereinafter "Lewark" and collectively "the QCC Defendants")[2], by counsel, Brian M. Pierce, respectfully submit this Brief in Support of their Motion for Summary Judgment, pursuant to S.D. Ind. L.R. 7-1(b)(3), requesting judgment in their favor on all of Plaintiff, Douglas Gosser, as Personal Representative of the Estate of Brian Lee Gosser's (hereinafter "the Estate"), claims pursuant to Fed. R. Civ. Pro. 56(a) and S.D. Ind. L.R. 56-1.

## I. INTRODUCTION

The Estate filed its Complaint against Richard A. McCorkle, individually and in his official capacity as Sheriff of Henry County (hereinafter "Sheriff McCorkle"), Brent Grider, individually and in his official capacity as Jail Commander of Henry County (hereinafter "Grider"), and the QCC Defendants.[3]

The Estate alleged that the Defendants violated Brian Lee Gosser's (hereinafter "Brian") constitutional rights to be free from cruel and unusual punishment, reckless indifference to his serious medical needs, and to receive due process, among other rights hereinafter set forth, as protected by the Eighth and Fourteenth Amendments to the U.S. Constitution as actionable through 42 U.S.C. § 1983. The Estate also asserted Indiana state law claims for wrongful death and negligence claim against the Defendants.

---

[1] The proper spelling is "Westermen."
[2] The proper spelling is "Dennette."
[3] Defendants Henry County, Weesner, Huxhold, and Lecher were all previously dismissed.

## II.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.     At all times relevant, QCC provided healthcare services to inmates at the Henry County Jail (hereinafter "Jail") pursuant to a written Inmate Healthcare Service Agreement (hereinafter "the Agreement"). [Ex. A; Ex. F, pg. 22, lns. 17-23].

2.     Pursuant to the Agreement, QCC provided the following relevant medical services:

   a.  On site physician/medical director coverage, to include at least one physician visit per week and a physician available via telephone or email twenty-four (24) hours per day, seven (7) days per week;

   b.  on-site mental health care coverage to include at least one psychologist or mental health care provider visit every other week and a psychologist available via telephone twenty-four (24) hours per day, seven (7) days per week;

   c.  on-site nursing coverage to include up to sixty (60) hours nursing services per week;

   d.  a Nurse Administrator will be available for consultation by the Henry County nursing staff or correctional staff twenty-four (24) hours per day, seven (7) days per week and shall make weekly visits to complete administrative tasks and assist physician with sick call;

   e.  QMA staff will work up to twelve (12) hours per week to assist with medication set-up and pass; and

   f.  All medical or mental health care provided by QCC shall be rendered by professionals licensed to practice In the State of Indiana. A Nurse Practitioner (NP) or Physician's Assistant (PA) may be used in the physician schedule as agreed to by all parties.

3

[Ex. A, pg. 1; Ex. F, pgs. 23-23]

3. During the relevant period, the QCC medical staff assigned to the Jail were Dr. Benjamin Loveridge, M.D. (hereinafter "Loveridge"), Westermen, Lewark, and Stephenson. [Ex. G, ¶ 13]

4. Brian Lee Gosser (hereinafter "Brian") was arrested on February 17, 2016, for Operating While Intoxicated (OWI) [DE 1, ¶19].

5. Before being transported to the Henry County Jail, Brian was taken to the Henry County Hospital for medical clearance. [Ex. B, pgs.1-4]

6. Upon receiving medical clearance, Brian was transported to the Jail and booked in as a pretrial detainee. [Ex. B, pgs. 5-11]

7. Brian submitted two (2) written medical request forms sometime on February 22, 2016. [Ex. B, pg. 12-14]

8. The first was a written request to see the doctor or nurse and have his prescriptions filled, which was dated "2/19/15."[4] [Ex. B, pg.12]

9. The second was a written request to see the doctor or nurse for a possible concussion and nausea dated February 21, 2016. [Ex. B, pg.14]

10. The second request was accompanied by a protocol form completed by correctional officer Jayson Madden. [Ex. B, pg.15]

11. Westermen received those forms when she got to work on February 23, 2016. Westermen then met with, and evaluated, Brian at approximately 9:00 A.M. [Ex. B, pgs. 12, 14, 16].

12. Westermen obtained Brian's vital signs (blood pressure, respiration rate, and

---

[4] The request is dated 2/19/15 but all parties agree that the year was 2016.

pulse) which were within acceptable ranges and nonemergent. [Ex. B., pg. 16; Ex. G, ¶18]

13. Westermen evaluated Brian for any signs or symptoms of withdrawing from alcohol or a concussion. There were none. [Ex. B., pg. 16; Ex. G, ¶18]

14. Westermen consulted with Stephenson. Prozac was prescribed and ordered. Brian was instructed to stay hydrated and informed that ibuprofen was available from the commissary. The assessment and treatment were timely and medically appropriate. [Ex. B., pg. 16; Ex. G, ¶18]

15. Westermen's second interaction with Brian was on February 25, 2016, when she received a medical request form dated February 24, 2016. [Ex. B., pg. 17; Ex. D, ¶19]

16. Brian was requesting over the counter medication (Ibuprofen/Tylenol) for tooth pain. [Ex. B., pg. 17; Ex. G, ¶19]

17. Westermen evaluated Brian, including checking his teeth for infection or damage. Brian indicated that he would wait a few days to see if it got better. [Ex. B., pg. 17; Ex. G, ¶19]

18. Stephenson reviewed the evaluation on March 2, 2016, during his weekly visit. [Ex. B., pg. 17]

19. Again, the assessment and treatment were timely and medically appropriate. [Ex. B., pg. 17; Ex. G, ¶19]

20. On February 26, 2016, Gosser was evaluated by Lewark in response to tooth pain and rib pain from slipping "on wet floor." [Ex. B., pg. 18; Ex. G, ¶20].

21. Lewark consulted with Westermen and determined that it was a duplicate request from the day before. [Ex. B., pg. 18; Ex. D, pg. 100, lns 16-25 & pg. 101, lns 1-16]

22. The assessment and treatment were timely and medically appropriate. [Ex. G, ¶20]

23. On February 27, 2016, Lewark initiated an assessment of Brian after she observed him with injuries consistent with a physical altercation. [Ex. B., pg. 19-21; Ex. D, pg. 101-102]

24. Lewark completed a medical request for Brian out of concern for his well-being and safety. [Ex. B., pg. 19; Ex. D, pg. 102]

25. Although Brian's vitals were normal, he had physical injuries, and Lewark heard a popping noise in his lungs. [Ex. B., pgs. 20-21; Ex. D, pgs. 103-105]

26. Brian also disclosed that (3) inmates beat him up. [Ex. B., pg. 20-21; Ex. D, pg. 103-105]

27. Brian was unwilling to identify who had beaten him up. [Ex. B., pg. 20-21; Ex. D, pg. 106, lns 1-8].

28. As a result of the assessment, Lewark called Stephenson and the decision was made to send Brian to the emergency room. [Ex. B., pg. 19-21; Ex. D, pg. 106, lns 21-22]

29. Lewark also removed another inmate from Brian's block in an attempt to ascertain who had beaten up Brian. [Ex. B., pg. 20-21; Ex. D, pg. 110]

30. Lewark's assessment and treatment were timely and medically appropriate. [Ex. G, ¶ 21]

31. After approximately (3) hours at the Henry County Hospital Emergency Room, Gosser was discharged as stable with nonemergent, non-life-threatening diagnoses. [Ex. B., pg. 28-33; Ex. G, ¶ 22]

32. On February 28, 2016, Brian complained of nausea and vomiting to a correctional officer. A protocol was completed. [Ex. B., pg. 26 & 34]

33. The correctional officer contacted Lewark and then placed Brian in the "drunk tank" for medical observation. Also, the correctional staff was instructed to log each time Brian

vomited. [Ex. B., pg. 26 & 34, 36]

34. Once Lewark arrived at work on February 28, 2016, she met with Brian and notified Stephenson of Brian's injuries and complaints of pain. [Ex. B., pg. 35]

35. Stephenson ordered prescription strength ibuprofen for Brian. [Ex. B., 35].

36. Although Brian should have received a discharge summary upon his release from the emergency room, there is no evidence that the QCC Defendants actually received, or were provided, the discharge summary until February 29, 2016. [Ex. B., pg. 28]

37. On February 29, 2016, when Westermen arrived at the Jail, she received the document and made a handwritten notation that she contacted the emergency room for the physician's notes. [Ex. B., pg. 28]

38. The discharge instructions stated that Brian: 1) needs to be monitored for (24) hours for signs of head injury; 2) should be rechecked by a physician within (48) hours; 3) should return to the ER at once for any changing/worsening symptoms or any concerns; and 4) be given Tylenol and ibuprofen for pain and Benadryl for sleeping. [Ex. B., pg. 31; Ex. G, ¶ 23]

39. Deviations in those recommendations for stable patients with nonemergent, non-life-threatening diagnoses would be medically appropriate. In this case:

    a. Brian was under (24) hour monitoring at the Henry County Jail;

    b. Although the instruction stated Brian *should* be rechecked by a physician within (48) hours, he was rechecked by Stephenson within (4) days. Based on the circumstances of incarceration and available information, this was timely and medically appropriate.

    c. When Brian's condition worsened, he was taken to the Henry County Hospital Emergency Room.

   d.  Brian was receiving Ibuprofen.

[Ex. B., pg. 31; Ex. G, ¶ 24]

  40.  On March 2, 2016, Stephenson was at the Jail for his weekly visit and examined Brian for approximately (20) minutes. [Ex. B., pg. 37-38; Ex. C, pg. 59-60]

  41.  Brian indicated he was still having left rib pain, but Stephenson did not observe any Turner signs, redness or bruising. [Ex. B., pg. 37-38; Ex. C, pg. 59-60]

  42.  Brian was prescribed prednisone, Tylenol, ibuprofen. [Ex. B., pg. 37-38; Ex. C, pg. 59-60]

  43.  Stephenson's assessment and treatment were timely and medically appropriate. The addition of a more detailed late entry is common in the practice of medicine and well within the medical standard of care. [Ex. G, ¶ 26]

  44.  Then on March 3, 2016, while passing medications, Brian informed Westermen that he had been vomiting. [Ex. B, pg. 44]

  45.  She instructed him to relax and notify her immediately if he vomited again. [Ex. B, pg. 44]

  46.  When Westermen was notified by a corrections officer that Brian wanted to talk to her, she immediately went to see him. He was not vomiting but spitting in a cup. He also indicated his ribs hurt. She instructed him to rest and have ice chips. Brian had no other medical complaints during Westermen's shift. [Ex. B, pg. 44]

  47.  Later March 3, 2016, Brian informed Lewark that he was having trouble breathing. [Ex. B, pg. 39; Ex. D, pg. 147-148]

  48.  As she had done on February 27, 2016, Lewark check Brian's vitals and listened to his lungs. [Ex. B, pg. 39; Ex. D, pg. 148]

49.     Because he had just returned from the hospital and his oxygen level was still within a normal range, Lewark first attempted albuterol treatment ordered a mobile x-ray for Brian to be conducted at the jail. [Ex. B, pg. 39; Ex. D, pg. 150]

50.     When this didn't alleviate Brian's complaints of pain, Lewark ordered a chest x-ray at 6:31 P.M. [Ex. B, pg. 39-42; Ex. D, pg. 151]

51.     The x-ray was completed at 9:05 P.M. The results of the x-ray indicating a "slight right basilar infiltrate", most commonly associated with pneumonia. [Ex. B, pg. 40-42; Ex. D, pg. 126-127]

52.     Stephenson received, and immediately reviewed, the x-rays at approximately 9:30 P.M.  [Ex. B, pg. 40-42; Ex. D, pg. 126-127]

53.     The initial treatment was focused on treating pneumonia, which was the information provided from the x-ray physician. [Ex. B, pg. 40-42; Ex. D, pg. 126-127]

54.     When this treatment did not improve Brian's condition over the next (15) mins, Brian was ordered to be taken immediately to the emergency room. [Ex. B, pg. 40-42; Ex. D, pg. 126-127]

55.     Brian passed away in the early morning hours of March 4, 2016.

56.     The medical records from the Henry County Hospital from February 27, 2016, and requested on February 29, 2016, arrived by fax a few hours after Brian's death. [Ex. B, pg. 22-25]

57.     Justin R. Fannin, one of Brian's former cellmates, entered a plea of guilty to involuntary manslaughter on March 7, 2019 under Cause Number 33C01-1609-F3-000016 in Henry County, State of Indiana.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the movant shows there is no genuine dispute as to any material facts and that the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The purpose of summary judgment is to eliminate factually unsupported claims. *Id*. at 323.

The movant must support its assertion that there is no genuine issue of material fact by referring to applicable records, including depositions, interrogatory answers, or other relevant materials. Fed. R. Civ. P. 56(c). This standard instructs that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added). Further, the materiality of the facts is dictated by the substantive law, and it is those certain facts that are identified in the substantive law that governs the matter. *Id*. at 248. The material facts must be "genuine" which means the evidence could allow a reasonable jury to return a verdict for the nonmoving party. *Id*.

### IV. ARGUMENT

**A. The QCC Defendants did not violate Brian's constitutional rights under the 14th Amendment and 42 U.S.C. § 1983.**

The QCC Defendants respectfully submit to the Court that there is no genuine dispute as to any material facts and that they are entitled to a judgment as a matter of law on the Estate's claims under 42 U.S.C. § 1983. "The Eighth Amendment's ban on "cruel and unusual punishments" requires prison officials to take reasonable measures to guarantee the safety of inmates, including the provision of adequate medical care." *Minix v. Canarecci*, 597 F. 3d 824,

830-31(7th Cir. 2010).  Although the 8th Amendment applies only to convicted individuals, pretrial detainees, such as Brian, are entitled to the same basic protections under the 14th Amendment, and the same legal standards for deliberate indifference claims under the 8th Amendment apply.  *Id.* at 831.

To prevail on a claim based on inadequate medical care, the Estate must satisfy two primary elements: (1) Brian suffered an objectively serious harm that presented a substantial risk to his safety, and (2) the QCC Defendants were deliberately indifferent to that risk.

There is no evidence Westermen, Lewark, and Stephenson, in their individual capacities, did not violate Brian's constitutional rights under § 1983. A violation of the 14th Amendment's prohibition on cruel and unusual punishment only occurs "when the jail medical staff act with deliberate indifference to a prisoner's serious medical needs." *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017).  In order to sustain a § 1983 claim for violation of Brian's 14th Amendment right to adequate medical care, the Estate must show that: (1) Brian had an objectively serious medical condition; (2) that Westermen, Lewark, or Stephenson knew of the condition and were deliberately indifferent to treating him; and (3) this indifference caused Brian injury. *Gayton v. McCoy*, 593 F. 3d 610, 620 (7th Cir. 2010).

First, "an objectively serious medical condition is one that 'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Id*. (quoting *Hayes v. Snyder*, 546 F. 3d 516, 522 (7th Cir. 2008)).  The medical condition does not need not to be life-threatening; rather, it could be one results "in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* The QCC Defendants are not contesting whether Brian's medical condition is objectively serious.

11

Second, with regard to deliberate indifference, the Estate must show by admissible evidence that Westermen, Lewark, or Stephenson acted with a culpable state of mind. *Gayton*, 593 F.3d at 620. There must be evidence that Westermen, Lewark, or Stephenson had subjective knowledge of the risk to Brian's health, and that they disregarded the risk. *Id*. Evidence that they acted negligently is insufficient to prove deliberate indifference. *Id*. Deliberate indifference requires the conduct to be intentional or reckless with reckless meaning "conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Id*.

The evidence must show that Westermen, Lewark, or Stephenson were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. Even if Westermen, Lewark, or Stephenson recognized the substantial risk, they are not liable under 42 U.S.C. §1983 if they "responded reasonably to the risk, even if the harm ultimately was not averted." *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 843, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). In this case, the evidence does not support an issue of material fact as to whether Westermen, Lewark, or Stephenson acted with deliberate indifference.

However, the evidence, in this case, does demonstrate that until immediately before Brian being sent to the emergency room on March 3, 2016, Westermen, Lewark, and Stephenson had no belief that there was any substantial risk of serious harm to Brian. In every prior evaluation of Brian, his vital signs (blood pressure, respiration rate, and pulse) were always within acceptable ranges and nonemergent. Brian had twice been cleared by the hospital as stable and acceptable for detention at the Jail.

Furthermore, there is no evidence demonstrating that Westermen, Lewark or Stephenson was deliberately indifferent to any medical issues Brian had. Westermen and Lewark responded

to each of Brian's written requests the same day they were received. His vital signs (blood pressure, respiration rate, and pulse) were always within acceptable ranges and nonemergent. Westermen and Lewark consulted with Stephenson. When Brian didn't submit written requests, Westermen and Lewark took the time to evaluate him in response to verbal complaints. In fact, on February 27, 2016, Lewark actually completed a medical request for Brian when he disclosed that he had been beaten by other inmates. And when Brian refused to tell her who had beaten him, Lewark went to Brian's block to speak with other inmates in order to find out who had inflicted Brian's injuries. From the time Lewark evaluated Brian on the 27th to the time she sent him to the emergency room was approximately forty (40) minutes.

On March 3, 2016, Lewark responded immediately to Brian's complaints of pain, vomiting, and lack of energy. Vitals were taken, and she listened to his lungs. An albuterol treatment was given which had raised his oxygen saturation back to a normal range of (97%). When this didn't alleviate Brian's complaints of pain, Lewark ordered a chest x-ray at 6:31 P.M. Before she left for the day, she evaluated Brian again and provided instructions for the Jail staff. An hour later she responded to a call from jail staff and provided further instructions on caring for Brian. The x-ray was completed at 9:05 P.M. The results of the x-ray indicating a "slight right basilar infiltrate," most commonly associated with pneumonia. Stephenson received, and immediately reviewed, the x-rays at approximately 9:30 P.M. The initial treatment was focused on treating pneumonia, which was the information provided from the x-ray physician. When this treatment did not improve Brian's condition over the next (15) mins, Brian was ordered to be taken immediately to the emergency room. Although tragic, the only evidence is that Westermen, Lewark, and Stephenson provided constant medical care for the conditions they could identify. That is not deliberate indifference.

Third, the Estate must produce evidence that the proximate cause of the constitutional injury Brian sustained was the deliberate indifference of Westermen, Lewark or Stephenson. Ordinarily, proximate cause is a question to be decided by a jury. *Id*. at 624. However, as is the case herein, when a plaintiff can proffer no evidence that the alleged deliberately indifferent conduct caused or exacerbated the alleged injury, summary judgment should be granted on the issue of causation. *Id*. Evidence of Brian's diagnosis and treatment is insufficient because it does not provide any evidence the medical care provided exacerbated the condition or otherwise harmed him. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). In this case, there is no evidence that anyone other than other inmates, such as Justin R. Fannin, was the proximate cause of Brian's death.

Furthermore, by naming QCC as a Defendant, in this case, to establish a § 1983 claim, the Estate must show the alleged constitutional claims resulted from a policy or practice instituted by QCC. Therefore, the Estate must show: 1) an employee of QCC violated Brian's constitutional rights, and 2) the injury was the result of QCC's official policy or custom. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). Again, there is no evidence of any unconstitutional policy. And there is no evidence that any policy caused Brian's death. Again, Brian's death was caused by fellow inmates. There is no other evidence to the contrary.

**B.      There is no evidence designated to support the Estate's claims for negligence.**

The Estate's state law claims should be dismissed because the QCC Defendants were not negligent. To maintain a negligence claim sounding in medical malpractice, the Estate must show: "(1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty by allowing conduct to fall below a set standard of care, and (3) a compensable injury proximately caused by

14

defendant's breach of the duty." *Chaffins v. Kauffman*, 995 N.E.2d 707, 711 (Ind. Ct. App. 2013).  It is well settled the plaintiff must come forth with expert medical testimony establishing: (1) the applicable standard of care required by Indiana law; (2) how the defendant doctor breached the standard of care; and (3) that the defendant doctor's negligence in doing so was the proximate cause of the injuries complained of. *Sorrells v. Reid-Renner*, 49 N.E.3d 647, 651 (Ind. Ct. App. 2016); see also *Musser v. Gentiva Health Services*, 356 F.3d 751, 760 (7th Cir. 2004). "If medical expert opinion is not in conflict regarding whether the physician's conduct met the requisite standard of care, there are no genuine triable issues." *Simms v. Schweikher*, 651 N.E.2d 348, 350 (Ind. Ct. App. 1995).

As Dr. Loveridge attested, Brian was provided with medical care that met the standard of care. (Ex. G at ¶¶ 17, 20).  To date, the Estate has not identified any evidence to the contrary.

## V. CONCLUSION

The Estate failed to produce evidence which, viewed in the light most favorable to it, could allow a reasonable juror to conclude that the QCC Defendants acted with deliberate indifference towards him. Moreover, there is no dispute that the Estate failed to produce any evidence that Quality Correctional Care, L.L.C. had a policy or procedure which was the moving force behind the alleged violation of his constitutional rights. Finally, the Estate failed to designate any expert testimony to dispute Dr. Loveridge's testimony stating the standard of care was not breached while caring for Brian Gosser.

For these reasons, Quality Correctional Care, L.L.C. respectfully requests this honorable Court dismiss the claims against it with prejudice and grant it summary judgment as a matter of law.

Date: 04/01/2019               /s/ Brian M. Pierce
                               Brian M. Pierce, 24350-18

15

106 E. Washington Street
Muncie, Indiana 47305
Tel: (765) 289-9122
Fax: (765) 289-6064
Email: brianpiercelaw@aol.com
Attorney for the QCC Defendants

Certificate of Service

I, Brian M. Pierce, the undersigned counsel of record for Defendant, Quality Correctional Care, LLC, affirms under penalties of perjury that a copy the forgoing Motion for Summary Judgment has been electronically served on the following counsel of record this __1____ day of April, 2019:

Ronald E. Elberger
Jeffrey B Halbert
BOSE McKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204

Richard Andrew Young
DREW YOUNG LAW
107 S. Broadway Street
Greensburg, IN 47240

Caren L. Pollack
Pollack Law Firm
10333 N. Meridian, Suite 111
Carmel, Indiana 46032

Date: 04/01/2019                              /s/ Brian M. Pierce
                                              Brian M. Pierce, Ind. Bar # 24350-18