Page 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF INDIANA
 2         INDIANAPOLIS DIVISION
 3   Civil Action No. 1:17-CV-03257-TWP-MPB
 4
     DOUGLAS J. GOSSER, as Personal    )
 5   Representative of the ESTATE OF   )
     BRIAN LEE GOSSER,                 )
 6                                     )
                 Plaintiff,            )
 7        -vs-                         )
                                       )
 8   HENRY COUNTY SHERIFF'S DEPARTMENT;)
     RICHARD A. McCORKLE, individually )
 9   and in his official capacity as   )
     Sheriff of Henry County; and BRENT)
10   GRIDER, individually and in his   )
     official capacity as Jail Commander)
11   of the Henry County Jail; OFFICER )
     ROBERT HUXHOLD, OFFICER TERESA    )
12   WEESNER, OFFICER CLARK LECHER,    )
     individually and in their official)
13   capacities as Correctional        )
     Officers; QUALITY CORRECTIONAL    )
14   CARE, LLC; CHRISTOPHER STEPHENSON,)
     P.A.; TARA WESTERMAN, R.N.; and   )
15   DENETTE LEWARK, R.N.,             )
                                       )
16              Defendants.            )
17
         DEPOSITION OF TARA WESTERMEN, R.N.
18
                    Volume I
19
         The deposition upon oral examination of
20   TARA WESTERMEN, R.N., a witness produced and sworn
     before me, Tara Gandel Hudson, RPR, CRR, CSR
21   93-R-1039, a Notary Public in and for the County of
     Marion, State of Indiana, taken on behalf of the
22   Plaintiff at the offices of Bose McKinney & Evans
     LLP, 111 Monument Circle, Suite 2700, Indianapolis,
23   Marion County, Indiana, on the 1st day of August,
     2018, scheduled to commence at 9:00 a.m., pursuant
24   to the Federal Rules of Civil Procedure with
     written notice as to the time and place thereof.
25
```

Page 88

```
 1      We had to do blood pressure checks or any vital
 2      signs while they were being housed in there.
 3   Q  That's an open cell; correct?  When I say
 4      "open," it's barred?
 5   A  Not a cell.  Yes.
 6   Q  It's open bars?  You can see through the bars?
 7   A  Right.
 8   Q  At those points in time where you would come in
 9      and, say, do a blood pressure check, would there
10      be one or more inmates in there?
11   A  There could be one or more, yes.
12   Q  The nurse's office itself, when you would
13      conduct examinations or see an inmate in the
14      nurse's office, do you know whether there's
15      surveillance within the nurse's office?
16   A  Not in the nurse's office, no.
17   Q  Is there surveillance of the entrance to the
18      nurse's office?
19   A  There's surveillance of, like, the hallways and
20      everything right there.  Yes.
21   Q  You said you contracted out the X-ray services?
22      diagnostic service?
23   A  Right.
24   Q  When that occurred, the X-ray technician would
25      come to the jail; correct?
```

Page 89

```
 1   A  Right.
 2   Q  Where would they take the X-rays?
 3   A  It really just depends.  We've had them do it in
 4      the nurse's office.  We've had them do it in
 5      booking.  When I was there.  I mean, they came
 6      after we were there.
 7         Actually, they have done it down in the
 8      classroom.  It's wherever the space is
 9      available, whatever space they needed.
10   Q  Is the nurse's office locked when you or
11      Ms. Lewark were not there?
12   A  Yes.
13   Q  So no one could access that office other than
14      you two?
15   A  No.  There are jail keys.
16   Q  The officers could access that?
17   A  Right.
18   Q  You kept medications in the nurse's office?
19   A  Right.
20   Q  Were they kept under lock and key?
21   A  They're in a med cart locked.
22   Q  Who had access to that?
23   A  Medical and jail staff.
24   Q  Jail staff had access to that as well?
25   A  Yes.
```

Page 90

```
 1   Q  What purpose would jail staff have to access the
 2      medical cart?
 3   A  They pulled a protocol and got an order from the
 4      doctor.  And they needed -- had to give them --
 5         I mean, everything was in there.  Even
 6      ibuprofen.  We didn't keep ibuprofen or Tylenol
 7      even sitting out anywhere.  So they had to get
 8      in there and get that.
 9         Jail staff is trained to pass medications.
10      If there's ever occasion where they need to pass
11      medicine, they would have access to the med
12      cart.
13   Q  Did you ever have any instances of missing
14      medication?
15   A  Yes.
16   Q  When did those occur?
17   A  I have no idea.
18   Q  So I asked you earlier what your compensation
19      was at Quality Correctional Care.  Based on the
20      personnel records that we received in discovery,
21      you had indicated that your annual salary was
22      $48,000 as of August 14, 2017?
23   A  I have no idea what my annual salary was.
24   Q  Do you recall ever indicating on any documents
25      for Quality Correctional Care that your salary
```

Page 91

1  was $48,000?
2  A  The only time I ever remember indicating my
3     salary is life insurance; filling out life
4     insurance forms. I don't know why else I would.
5  Q  Do you know who the life insurance provider was?
6  A  I know because I just did it. Guardian.
7  Q  What's your current salary?
8  A  26 an hour.
9  Q  When do you first recall interacting with Brian
10    Gosser at the jail? Henry County Jail?
11 A  Besides reading paperwork that I charted?
12 Q  Yes, ma'am.
13 A  I remember seeing him when I was passing meds
14    one day for dental pain.
15 Q  What was that complaint, if you recall?
16 A  He had asked to see the dental, the dentist. I
17    remember I was doing his meds. I don't know if
18    he gave me the paper then or if I had it
19    already. I'm not sure.
20    I do remember asking him why he wanted to
21    see the dentist, which was normal. We always
22    asked why they want to see the dentist. I
23    remember him telling me that he hit his mouth on
24    the shower wall.
25 Q  Do you recall what block he was in at that

Page 92

1     point?
2  A  He was in F block then.
3  Q  Did you complete any progress notes, charting,
4     or anything like that for that instance?
5  A  I mean, I've seen it in my progress note
6     paperwork, but I don't remember physically doing
7     that at that time.
8  Q  When was the last time you looked at the
9     progress notes that you're referring to for
10    Mr. Gosser?
11 A  Last Wednesday.
12 Q  Was that in preparation for today?
13 A  Yes.
14 Q  How long did that take you to go through those
15    documents?
16 A  I didn't watch my watch to see.
17 Q  Was anyone else present when you were doing that
18    review?
19 A  Yes.
20 Q  Was that Mr. Pierce?
21 A  Yes.
22 Q  Was anyone else there?
23 A  No.
24 Q  In terms of anything that you did with
25    Mr. Gosser or any interactions you had with

Page 93

1     Mr. Gosser, were those all documented?
2  A  What do you mean?
3  Q  As far as the medications that may have been
4     dispensed or any discussions about medical
5     issues that he had while he was at the jail,
6     were those all documented?
7  A  Yes.
8  Q  And in terms of your recollection of those
9     interactions, would it help you to actually see
10    the medical records in order to go through those
11    interactions?
12 A  Yes.
13    (Deposition Exhibit 27 was marked for
14    identification.)
15 Q  Ms. Westermen, I'll represent to you that these
16    are the contents of the Quality Correctional
17    Care medical file from Brian Gosser that were
18    produced to us in discovery.
19 A  Okay.
20 Q  You are welcome to go through the document, the
21    full document, if you like, but I'm going to --
22    You said that would help?
23 A  Yes.
24 Q  I think it might help today if we do that.
25    MR. HALBERT: Let's go off the record while

Page 94

1     she does that.
2     (A recess was taken between 11:30 a.m. and
3     11:36 a.m.
4  BY MR. HALBERT:
5  Q  Ms. Westermen, we've handed you what's been
6     marked as Deposition Exhibit 27, which is the
7     complete medical file received from QCC in
8     discovery in this case.
9     You've had an opportunity to review that;
10    correct?
11 A  Yes.
12 Q  And based on your review, does this appear to be
13    an accurate reflection of the medical records
14    that QCC maintained for Mr. Gosser?
15 A  From my knowledge, yes.
16 Q  Do you recall anything else outside of this
17    packet of documents that would have been
18    included in this file?
19 A  No.
20 Q  Now, when an inmate comes into the Henry County
21    Jail, did you participate in the intake process,
22    or was that conducted by the officers?
23 A  By the officers.
24 Q  And did the officers provide you with
25    information relative to the intake process?

Page 95

1  A   There are certain pages in the intake that they
2      print off and give to us.
3  Q   Did you see those based on your review of this
4      packet of documents?
5  A   Yes.
6  Q   Can you identify the numbers at the bottom of
7      the page where those start?
8  A   QCC000544.
9  Q   Okay. That's the mental health awareness form.
10     So they do a mental health check at the
11     beginning or in the intake process?
12 A   Yes.
13 Q   Is that part of the training that QCC provides
14     to officers? The mental health portion?
15 A   No.
16 Q   Who provides that to the officers, if you know?
17 A   We do provide the mental --
18     We provide mental health training, but this
19     form is not a Quality form. It's a jail form.
20 Q   And to your knowledge, do you know what the
21     purpose of that particular form is?
22 A   Honestly, no.
23     I know Brent Grider had brought this paper
24     from another jail. And they started
25     implementing it for the officers to use for --

Page 113

1  A   No.
2  Q   Were you aware that Mr. Gosser was sent to the
3      ER on February 27 for injuries that he had
4      sustained in one of the blocks?
5  A   Not when it happened.
6  Q   When did you become aware of that?
7  A   I know from paperwork. I don't have an exact
8      day.
9  Q   Do you recall any discussions with Mr. Gosser
10     about setting up a time to meet with
11     Mr. Stephenson when he came to the jail sometime
12     after February 27?
13 A   I do not remember.
14 Q   How would an inmate go about setting up a time
15     to meet with the PA or even the physician when
16     they were at the jail? Is it based on whatever
17     that schedule is, or is that a specific request
18     they have to make?
19 A   No. So if somebody is sent to the ER, they have
20     injuries or -- if somebody's sent besides for
21     medical clearance, then they do follow-ups with
22     the jail provider.
23 Q   The inmate does?
24 A   Yes.
25 Q   But did you have any involvement in arranging

Page 114

1      for Mr. Gosser to meet with Mr. Stephenson at
2      any point?
3  A   I don't remember.
4  Q   Do you recall whether he did meet with
5      Mr. Stephenson?
6  A   I know from paperwork that he did, but I do not
7      remember from memory.
8  Q   Did you ever examine Mr. Gosser after he
9      returned from the ER on February 27?
10 A   I don't remember any interactions with him
11     besides seeing him with the dental thing and
12     then that night I sent him out.
13 Q   Do you recall interactions about Mr. Gosser
14     while he was still at the jail?
15 A   With other people?
16 Q   Yes, ma'am.
17 A   I don't.
18 Q   Do you recall making a request or speaking with
19     Mr. Stephenson about ordering X-rays for
20     Mr. Gosser?
21 A   I didn't. I never ordered X-rays.
22 Q   Who was that, if you know?
23 A   Dennette ordered X-rays.
24 Q   Do you have a recollection of speaking with
25     Officer Lecher at the jail relative to the

Page 115

1      results of those X-rays?
2  A   I do remember him contacting me with the results
3      of X-rays, yes.
4  Q   And do you recall having Officer Lecher send
5      those to you? Those results?
6  A   I remember calling Chris to tell him to talk to
7      him about the results and call the jail back.
8  Q   Well, if Officer Lecher --
9  A   They don't usually send them to us.
10 Q   Well, I'll ask my follow-up question.
11     If Officer Lecher has indicated, during the
12     course of investigation into the death of Brian
13     Gosser at the Henry County Jail, that you asked
14     him to send you the results of those X-rays or
15     pictures of those X-rays so you could see them,
16     is that an incorrect statement?
17 A   That could have been very possible.
18 Q   But you don't recall that happening?
19 A   I don't remember that happening, but it's
20     possible that could have happened. It's not
21     something that we would normally do, no.
22 Q   When an inmate is sent out to the ER, and they
23     are returned to the jail, what information does
24     QCC medical staff receive relative to that
25     discharge?

Page 116

1  A  The discharge papers that you have on the 540.
2  Q  On 540?
3  A  The QCC 540. Exhibit 27.
4  Q  So this would be a document that you would
5     receive from the hospital at the time that they
6     are returned to the jail?
7  A  Yeah. I mean, this is not the exact document,
8     but that's the discharge.
9  Q  Something similar to this?
10 A  Correct.
11 Q  Are there times where you have to await
12    information from the hospital when an inmate is
13    returned to the jail?
14 A  They never send us paperwork pertaining -- even
15    if we send them there, they will never give us
16    any paperwork. We have to request all the
17    notes, all the records, everything.
18 Q  How do you make those requests?
19 A  We fax over -- we have to have --
20    The patient has to sign a release of
21    information -- we call them ROIs -- and we have
22    to fax it to medical records. So pertaining to
23    the hospital, we send it to the medical records
24    at Henry County hospital. And they have so many
25    days they can send the results back over.

Page 117

1  Q  Could you call the hospital and ask them to send
2     the records over?
3  A  I can call and ask them; they will not do it.
4  Q  What if the inmate is incapacitated?
5  A  They will not send us records unless there is a
6     signature.
7  Q  Okay.
8  A  If they're incapacitated, we would have them in
9     jail.
10 Q  Well, what if they became incapacitated --
11 A  Send them to the hospital --
12    (Simultaneous discussion interrupted by
13    the reporter.)
14 BY MR. HALBERT:
15 Q  What if they became incapacitated at the jail
16    and you needed to determine what was going on?
17    Could you make that request without going
18    through that process?
19 A  No. We would send them to the ER.
20 Q  Okay.
21 A  Had any inmate ever became incapacitated where
22    they could not answer questions, they were
23    incoherent, no, we send them. We would not wait
24    for anything like that.
25 Q  Whose responsibility is it to make a

Page 118

1     determination to send an inmate to the ER?
2  A  I would send somebody without calling a doctor
3     if I felt like they needed to go.
4  Q  Would you have follow-up to get approval --
5  A  I don't have to have approval to send somebody
6     to the ER, no. We would contact the doctor.
7  Q  At any point in time between February 2016 and
8     March 3rd of 2016, were you provided or was
9     QCC provided, to your knowledge, information
10    relating to the injuries that Mr. Gosser
11    sustained on or around 2-26 at the jail?
12 A  From memory, I do not remember getting any -- I
13    don't remember. That's what I'm trying to tell
14    you. I do not remember anything besides what
15    I'm sitting here reading.
16    I can read this and tell you that I know
17    that they sent this discharge paper, the 565.
18    When he came back to the jail, he was cleared to
19    come back on the 27th. It says what the
20    hospital recommended for the injuries that he
21    sustained. And I know, because it said at the
22    top "contacted ER waiting for ER physician
23    notes" they were contacted, and we're waiting
24    for them to come back.
25 Q  But in terms of that contact that you're

Page 119

1     referring to, was that contact that you made or
2     someone else?
3  A  It looks like my writing.
4  Q  In terms of any additional steps that you took
5     to determine any discharge information or other
6     issues for Mr. Gosser, is that the extent of
7     what you did?
8  A  So all the discharge paperwork has follow-up
9     care on the back. So if they would recommend us
10    to send them to ortho, plastic surgery for a
11    follow-up. I mean, there's multiple different
12    things you could send somebody to any kind of a
13    specialist.
14    Our doctor provider, whoever it is,
15    technically, they have to write the orders
16    because they're in the jail, they're confined,
17    and anything there is through them. But
18    anything that the hospital recommends, I've
19    never came across a doctor that said, "No, we're
20    not doing that."
21 Q  You're referring to page 565 in terms of the
22    discharge report?
23 A  Yes.
24 Q  Dated February 27?
25 A  Yes.

Page 120

1  Q  And that continues through 570?
2  A  Yes.
3  Q  And as you sit here today, do you recall
4     reviewing this information while Mr. Gosser was
5     still at the jail?
6  A  I don't recall.
7  Q  Okay. And based on your handwritten note at the
8     top of page 565, it says "Contacted ER. Waiting
9     for ER physician notes."
10    Were the physician notes different than a
11    discharge report?
12 A  Absolutely.
13 Q  And that contact with the ER for the physician
14    notes wasn't made, apparently, until
15    February 29th?
16 A  Right.
17 Q  Which is a Monday that year because it was a
18    leap year?
19 A  Sure.
20 Q  There's usually not a February 29th, so --
21 A  Yes.
22 Q  -- I guess it's leap year.
23    In terms of those physician notes, do you
24    recall when you received them?
25 A  (No response.)

Page 128

1     March 2, 2016. Would you still have been at
2     work at that point? Do you know?
3  A  In the evening?
4  Q  Yes, ma'am.
5  A  No.
6  Q  It looks like you had left at 3:50 that day?
7  A  Okay.
8  Q  Did you have any discussions with Mr. Stephenson
9     about that evaluation that Mr. Stephenson had
10    done of Mr. Gosser?
11 A  I don't remember having a discussion, no.
12 Q  Page 575.
13 A  Okay.
14 Q  It appears to be a progress note that
15    Mr. Stephenson completed relative to the
16    examination of Mr. Gosser on March 2.
17    Would you agree with that?
18 A  Yes.
19 Q  Now, this one indicates it's a late entry, and
20    it's dated March 9.
21    Is it common for progress notes to be
22    completed so long after an evaluation?
23 A  Yeah, that happens. In consideration that he
24    passed away, they probably wanted to add more to
25    his note but --

Page 129

1  Q  I don't want to belabor the point.
2     Going back to that progress note at 572.
3     Had there been interaction or evaluation by
4     Ms. Lewark of Mr. Gosser on February 28, would
5     that be reflected in a more detailed progress
6     note?
7  A  Not necessarily, no.
8  Q  And then in terms of what's written here, it
9     indicates "PA notified TO"; is that right?
10 A  Yeah.
11 Q  What does that mean?
12 A  So TO is telephone order via verbal order, but
13    they're used the same. Some people still write
14    "telephone order." I always write "verbal
15    order."
16 Q  Does that mean she contacted Stephenson, the PA,
17    to get a prescription of the ibuprofen?
18 A  Correct.
19 Q  Now, do you recall any discussions with
20    Ms. Lewark relative to issues with Mr. Gosser
21    and his inability to breathe or having shortness
22    of breath in or around the March 2, March 3 time
23    frame of 2016?
24 A  I do remember her calling me that evening. She
25    was -- I don't know if she was at the jail or if

Page 130

1     she'd already left for the day, to be honest.
2     But I remember talking to her. She had
3     told me that she had done a breathing treatment
4     on him. He was complaining of shortness of
5     breath or breathing issues. I remember us
6     talking about a chest pain, or she'd gotten an
7     order for a chest X-ray. But other than that, I
8     don't.
9     Oh. And after that, I think she called me
10    again and said she told the staff to contact me
11    about the X-ray results. But other than that, I
12    don't remember talking to her about anything
13    else.
14 Q  Why would she have the jail staff contact you if
15    you weren't the one who ordered the X-ray?
16 A  So I could contact the doctor.
17 Q  Why couldn't she contact the doctor?
18 A  I don't know. If she wouldn't be with her
19    phone. If she didn't have good cell service.
20    There's multiple reasons why.
21    I've asked multiple times that if "Hey, if
22    you try to call me, I'll answer you to call
23    somebody else." I mean, I could service. I
24    know Dennette's got kids so --
25 Q  Were you aware she had indicated to jail

Page 131

1   officers that they should contact you about
2   X-ray results?
3 A  At the time that she done that?
4 Q  Yes, ma'am.
5 A  No.
6 Q  Had you evaluated or seen Mr. Gosser that
7   particular day?
8 A  I had done meds that day. I seen him. I passed
9   meds that morning.
10 Q  Anything significant about Mr. Gosser stand out
11   from that day?
12 A  He wasn't being very pleasant. He --
13     I can't remember if he told me or an
14   officer that he had thrown up or had spit up. I
15   went back to check, I remember that. And he had
16   a cup. And he had spit into the cup, like just
17   literally spit in a cup. And I told him if he
18   didn't feel good, I'm like "Why are you up
19   jumping around? If you don't feel good, why
20   don't you lay down"?
21 Q  When you say "up and jumping around," what was
22   he doing when you saw him?
23 A  Like up moving around and just wouldn't sit
24   down. He was in a small cell.
25 Q  He was in a different cell at that point;

Page 132

1   correct?
2 A  Yeah.
3 Q  It was a significantly smaller cell than where
4   he was; correct?
5 A  Yes.
6 Q  And did he appear to be in any pain?
7 A  No.
8 Q  Were you aware at that point in time what his
9   injuries actually were?
10 A  I'm sure -- I'm sure at some point with him
11   coming back from the hospital, that yeah, I
12   found out.
13 Q  You don't recall when that was?
14 A  I don't recall when that was. I know that that
15   day when I was there and did meds, he did not
16   look like anything was wrong with him.
17 Q  How was his coloring? Do you recall?
18 A  Nothing was abnormal to me.
19 Q  Did you take any vitals at that point?
20 A  No, I did not.
21 Q  And you say he said he was spitting up or
22   vomiting -- is that what you said? -- into a
23   cup?
24 A  Right. He told me he had spit in a cup. Like
25   just regular spit; like not vomiting. It was

Page 133

1   not vomit. There was nothing abnormal about it.
2 Q  Did you tell him that you needed to actually see
3   it? You actually had to see him vomit?
4 A  Yeah. There was a lot of times we would tell
5   people if they were getting sick, "If you're
6   getting sick, let us see so we can see that
7   you're getting sick, not just saying that you're
8   getting sick." It's not that he's lying but --
9 Q  Was there any other interaction at that
10   particular time or that day that you can recall
11   with Mr. Gosser?
12 A  Not that I remember.
13 Q  Now, in terms of med pass, that occurs --
14   what? -- in the morning and then one in the
15   evening --
16 A  Yes.
17 Q  -- usually?
18     And are there particular designated times
19   where that occurs?
20 A  No. We just have an a.m. and a p.m.
21 Q  In terms of the ibuprofen that Mr. Gosser had
22   been prescribed by Mr. Stephenson, along with it
23   looks like Prednisone and Tylenol, a thousand
24   milligrams, would those also be distributed at
25   those points in time?

Page 134

1 A  The Prednisone was only once a day, but the
2   other ones were twice a day, yes.
3 Q  If I referred you to the last two pages of this
4   med pack document, that's the distribution of
5   medication relative to Mr. Gosser; correct?
6 A  Right. We call it a MAR sheet.
7 Q  A MAR sheet? Medication administration record?
8 A  Yes.
9 Q  If we're just looking at the -- I guess it's
10   583. You got the ibuprofen 800 milligrams, one
11   tab twice daily. Is that your handwriting; is
12   that someone else's?
13 A  The second one?
14 Q  Yeah.
15 A  Or the third one?
16 Q  Well, any of them.
17 A  I think the second one's mine and the first one.
18 Q  But in terms of the February 28 entry, is that
19   what that is? Ibuprofen 800 milligrams, one tab
20   twice daily. It shows the a.m./p.m.
21   distribution?
22 A  On 584?
23 Q  583 and 584.
24 A  February is 584, though, right? Yes.
25 Q  Yeah.

Page 135

1  A  Okay. That's not my writing.
2  Q  That's not?
3  A  No.
4  Q  But that shows that that entry is carried over
5     to 583, which is the MARs entries; correct?
6  A  Right.
7  Q  Does that show the distribution of the ibuprofen
8     800 milligrams on February 28?
9  A  Yes.
10 Q  All right. Is there any reason why there's --
11    strike that.
12       Is there any reason why there's not an
13    entry for February 29 or March 1st on either one
14    of these MARs documents?
15 A  The 583 won't have anything from February.
16    That's a March.
17 Q  Okay.
18 A  Each month there's a new MAR made.
19 Q  Yeah.
20 A  Everything would be on the February.
21 Q  If February 29 occurred in 2016, is there a
22    reason why there's not an entry for med
23    distribution to Mr. Gosser on February 29?
24 A  There is.
25 Q  Where is that?

Page 136

1  A  On the 584 sheet where it's initialed off that
2     he received medications on the 29th of February.
3  Q  I'm sorry. Can you refer to me where you're
4     looking at?
5       MR. PIERCE: You're going to have to show
6     them how that sheet works.
7  A  On 584 --
8       So on the med sheets, running down the left
9     column is the meds. Along the top of all the
10    med sheets, the dates, that's the actual date of
11    the month, obviously. I'm sure you know that.
12      So on the MAR, on the 584, that 29 is
13    February 29 that medications were administered.
14    So those boxes are where we initial that we gave
15    them medications.
16 BY MR. HALBERT:
17 Q  Okay.
18 A  If they didn't get them or they refused meds,
19    then we would put an R and circle it.
20 Q  Okay. Just so that we make sure the record's
21    clear and I'm on the same page, because I
22    obviously don't do these on a daily basis.
23 A  Okay. I understand.
24 Q  You've gotten a list of numbers up here?
25 A  Right.

Page 137

1  Q  Obviously, there's not 31 hours in a day;
2     there's 31 days potentially in a month.
3  A  Right.
4  Q  You've got the 28th here.
5  A  Yes.
6  Q  This is on 584 for February?
7  A  Correct.
8  Q  Then you've got February 29. And these initials
9     here show that he was distributed the ibuprofen?
10 A  Right.
11 Q  And fluoxetine?
12 A  Yes.
13 Q  And the same on 583, which is March; correct?
14 A  Right. He was given meds every day from
15    February 25th to March 3rd.
16 Q  Well, I don't see an entry for the p.m.
17    distribution on March 2nd of ibuprofen.
18 A  Umm --
19 Q  Or March 1st. I'm sorry.
20 A  So the second entry for ibuprofen, it was
21    discontinued. So that order, you can't see it
22    on here because it's probably highlighted out,
23    which is what we do to discontinue stuff. Where
24    it says "order," that says "order changed."
25       So he got that ibuprofen on March 1st. But

Page 138

1     she rewrote the orders, so you see on the next
2     ibuprofen and the Tylenol, it was 3-2.
3  Q  When you say "she changed the orders," who is
4     "she"?
5  A  That's Dennette's handwriting.
6  Q  Okay.
7       Now, going back to you said that Mr. Gosser
8     spit into a cup, said he was throwing up or
9     vomiting, and it just looked like he had spit
10    into a cup.
11      Do you know whether Mr. Gosser had eaten
12    that day?
13 A  I have no idea.
14 Q  Is it possible that he was -- had dry-heaves of
15    some type?
16 A  If he wouldn't have ate, when they picked his
17    tray up, they are supposed to mark whether they
18    eat or not or they refused their tray.
19 Q  Do you recall seeing anything that indicated he
20    had refused his tray?
21 A  No.
22 Q  Do you know whether he had given his food to
23    other inmates in his cell block?
24 A  No idea.
25 Q  In terms of the protocols that we've talked

Page 139

1  about today, there's a protocol that relates to
2  nausea and vomiting, is there not?
3  A  Yes.
4  Q  And there's specific protocols that should be
5     followed if an inmate is indicating that they're
6     nauseous or they're vomiting?
7  A  For the jail staff.
8  Q  For the jail staff.
9  A  I mean, those protocols for the jail staff.
10 Q  Correct.
11    Did you say that Brian indicated to you
12    that he was vomiting first or that he talked to
13    a jail officer first?
14 A  I don't remember, but I do remember going back
15    in there. I do remember asking him to fill the
16    health request, and he told me he wasn't
17    freaking filling the health request out.
18    MS. POLLACK: I'm sorry, I couldn't hear
19    you.
20    THE WITNESS: He said he wasn't filling out
21    a health request.
22    MS. POLLACK: He wasn't feeling what?
23    THE WITNESS: He refused to fill out a
24    health request.
25 A  The whole point of the health request, when we

Page 140

1     do meds and stuff, if you have two people, two
2     inmates from each block tell us something or ask
3     for something, they are always told they have to
4     fill out a health request. Obviously if they're
5     having chest pains or something like that, then
6     no. We don't say, "Oh, no, fill a paper out."
7     No, that's what we see them for.
8        That's the whole reason why we have this
9     procedure for us. I can't remember 20 different
10    things that people tell me when I'm doing meds.
11    So they fill the health request out. That way
12    we can see them for them to initiate their care.
13 BY MR. HALBERT:
14 Q  You're aware at that point in time that
15    Mr. Gosser had been at the ER that prior
16    weekend; correct?
17 A  Yeah.
18 Q  You testified today that you saw the discharge
19    summary at some point and were aware what his
20    injuries were at that point in time; correct?
21 A  Yes.
22 Q  And would you consider that to be a serious
23    medical problem; that he was having or at least
24    had the injury that he had?
25 A  If he was vomiting and having issues, yes. But

Page 141

1     when I seen him, there was absolutely nothing
2     wrong with him. He was up and wouldn't sit down
3     and was moving around the cell. He wasn't being
4     very pleasant. Not -- he wasn't telling me,
5     like, "I'm sick. I don't feel good." He was,
6     like, "I threw up. You have to see me." It
7     wasn't "I'm vomiting, help me, come and check
8     me," or anything like that.
9  Q  So you're --
10 A  He wasn't having shortness of breath. He wasn't
11    having any problems. Anytime I've ever had
12    somebody that's had any medical issues, I'm not
13    just going to leave them somewhere, leave them
14    in a cell if something's wrong with them. I'm
15    going to pull them out and check them.
16 Q  So you questioned the legitimacy of what he was
17    saying?
18 A  I did not see him throw up nor had anybody else.
19 Q  How many inmates have you treated at the Henry
20    County Jail who have had broken ribs?
21 A  I have treated people at the jail with broken
22    ribs multiple times.
23 Q  With multiple broken ribs?
24 A  I have.
25 Q  In those instances, have they indicated that

Page 166

1     procedures relative to sentinel events that QCC
2     has implemented?
3  A  I think mental health does something like that.
4  Q  But you're not aware of any particular policies
5     or procedures that QCC has in place or that they
6     have implemented relative to sentinel events?
7  A  I don't know.
8  Q  In terms of this April 7, 2016, discussion that
9     you had at the jail with the sheriff, are you
10    aware of any results of any investigations that
11    QCC conducted into the death of Brian Gosser?
12 A  I'm not.
13 Q  Are you aware of any documentation that was
14    prepared or that you provided as part of any
15    investigation that QCC conducted into the death
16    of Brian Gosser?
17 A  I faxed them their medical file, but I don't
18    know. I assumed it was for this.
19 Q  Do you believe that inmates or detainees in jail
20    should receive any different treatment than
21    private citizens?
22 A  Do I think they should receive different
23    treatment or not receive?
24 Q  Should they receive different treatment?
25 A  No.

Page 167

1  Q  Do you believe that you provided all necessary
2     care to Brian Gosser while he was housed at the
3     Henry County Jail?
4  A  I do.
5  Q  Do you believe there was anything you could have
6     done or that QCC could have done or anyone could
7     have done to prevent his death?
8  A  No.
9  Q  Why was it that the decision was made to have
10    X-rays of Brian Gosser on March 3rd? have those
11    done?
12 A  I don't remember exactly. But ribs, if he had
13    broken ribs, have them read them. Check to make
14    sure he didn't puncture a lung.
15 Q  Do you know whether any X-rays or other tests
16    were ordered to be performed by an outside
17    provider when he was sent to the ER on
18    February 27th?
19 A  Not to my knowledge.
20 Q  Have you ever had any discussions with
21    individuals at the jail, Sheriff McCorkle or
22    QCC, about containing costs?
23 A  No.
24 Q  Never specifically indicated anything to you
25    about reducing costs or minimizing costs?

Page 168

1  A  No. Not part of my job.
2  Q  Do you know any of the particulars about the
3     amounts of money that Henry County pays to QCC
4     relative to the health care?
5  A  I know that every jail paid a monthly amount to
6     Quality. That's part of our contract. But how
7     much that amount is? No.
8  Q  Where is the Henry County hospital in relation
9     to the jail?
10 A  (No response.)
11 Q  I should say how far?
12 A  A few minutes.
13 Q  About how long would it take to drive there,
14    roughly?
15 A  Five minutes.
16 Q  Normally, if an inmate is being transferred out
17    or sent to the hospital, who usually transports
18    them?
19 A  Either jail staff can transport them or they can
20    call an ambulance. Jail staff always goes with
21    them, but it's either jail staff taking them in
22    a County vehicle or an ambulance takes them.
23 Q  Do you know how Brian Gosser was transported to
24    the hospital on March 3?
25 A  I do not.

Page 169

1  Q  Do you know how he was transported to the
2     hospital on February 27, 2016?
3  A  I do not.
4  Q  Would it have been possible for you to drive up
5     to the Henry County hospital, which is five
6     minutes away, to get any additional information
7     for the treatment of Mr. Gosser on February 27?
8  A  No. Because I don't work for the hospital, so
9     they will not release records. It's a HIPAA
10    violation. It's illegal.
11 Q  Could you have obtained an authorization to
12    release that information from Mr. Gosser to do
13    that?
14 A  I did.
15 Q  When did you get that?
16 A  That's -- when I contacted them to have them
17    faxed, we have to send that paperwork for them
18    to fax them back.
19 Q  Well, the reason I ask is because I don't see a
20    release for that information in the medical
21    file. Would that be a document that's in the
22    file?
23 A  Sometimes.
24 Q  Well, in the other times where is it?
25 A  I mean, it would be in the file, but I don't

Page 170

1     know why his isn't in there, no.
2         MR. HALBERT: Let's take a quick --
3     I'm just about done, so let's take a quick
4     break.
5         MR. PIERCE: You're just about done and
6     we're going to take a break?
7         MR. HALBERT: I said, "Just about." I
8     didn't say I'm done yet.
9         (A recess was taken between 1:28 p.m. and
10    1:34 p.m.)
11 BY MR. HALBERT:
12 Q  So Ms. Westermen, just a few more questions.
13    We were looking at the medical file for QCC
14    and the faxed information that was sent in on
15    March 4 to you -- if you want to refer to it you
16    can -- but we were talking about the ability to
17    obtain information on Mr. Gosser.
18 A  Correct.
19 Q  You indicated that you could not get that from
20    the jail because you needed an authorization.
21 A  Right.
22 Q  And is it your testimony today that you had that
23    authorization in order to receive the fax that
24    you got on March 4?
25 A  I don't see it. I don't remember faxing or

Page 171

calling. I don't even know if I'm the one that specifically done it. That's how we always get records. They won't just send them. We have to request them.

Q  The fax on March 4 was sent directly to you. Your name is identified on the cover sheet of the fax with the physician notes.

A  Okay.

Q  Does that indicate that you made the request, or does that just indicate that they are sending it to the RN at the jail?

A  It could have been that I made the request. I'm not saying I didn't. I just don't remember doing it. The other thing is a lot of times, any stuff that's sent there we've had before they had me as the person at the jail, and they would send them with my name.

Q  And if the request was made, would that -- sorry. I'll ask a better question.
    If the request for information on Mr. Gosser was made on February 29, which is what the notation said on the discharge paperwork, would that request be or should it have been included in the medical file per QCC?

A  Yes.

Page 172

Q  Would you agree that we have not seen that today?

A  I would agree with that.

Q  All right. And in terms of Mr. Stephenson's visit with Mr. Gosser on March 2 of 2016, are you aware of what information he had in his possession relative to the injuries that Brian had?

A  Say that one more time with your dates.

Q  Sure. Based on the medical records, Chris Stephenson saw Brian Gosser on March 2 of 2016.

A  Okay.

Q  We looked at the jail records in terms of the time, so it was around 6:00-something at night.
    Are you aware of what information Mr. Stephenson had when he conducted that exam?

A  Information in his chart besides -- well, according to the dates, obviously anything after that. In the hospital, he would have had discharge instructions.

Q  So it would have included the discharge instructions that we've talked about today?

A  Right. Not the medical notes.

Q  Not the medical notes.

A  Yes.

Page 173

Q  To the best of your knowledge, do you know whether Mr. Stephenson reviewed those discharge notes or discharge summaries before he conducted the exam of Mr. Gosser?

A  I don't know.

Q  Are you aware of any disciplinary action that was taken against any medical staff after the death of Mr. Gosser on March 4 of 2016?

A  No.

Q  Did you have any discussions with Mr. Grider relating to Brian Gosser's injuries that he sustained sometime around February 26-27, 2016?

A  I don't remember.

Q  No discussions of treatment or how he was doing or anything of that nature?

A  No.

Q  In terms of QCC's provision of the medical care at the jail, who's considered the nurse supervisor?

A  Our regional nurse manager.

Q  Which is who?

A  That's who I was talking about earlier: Sandy Franklin, Stephanie Clapp. Kelly Kuntzler was there. I don't know if she was there at that time frame. I'm not sure which one it was at

**From:** Sandra Franklin <srfranklin1@yahoo.com>
**To:** Brianpiercelaw <Brianpiercelaw@aol.com>
**Subject:** Fwd: Jail
**Date:** Mon, Sep 3, 2018 9:42 pm



Sent from my iPhone

Begin forwarded message:

> **From:** Tara Westermen <twestermen@yahoo.com>
> **Date:** March 23, 2016 at 5:32:25 PM EDT
> **To:** srfranklin1@yahoo.com
> **Subject: Jail**

Okay. I guess I'll just start with where a lot of the issues arise from. Some of this is for your info, other parts for the meeting. There is NO discipline in the jail. At all. Today for instance and inmate asked for something and I told him he would have to wait because I was doing meds. I then was called (please excuse the language) fuck you bitch. I'm going to beat your ass. Continuously. Nothing was said. We went into the block and inmates were standing on the tables yelling threats. Again nothing said. It's like this everyday. Inmates ask when the sheriff is going to take the jail back because this is their jail. They constantly manipulate the air lines allowing them full access to not be locked down. Doors won't close due to this and when u open the door to the block inmates are all standing in the doorway. It's difficult for us to pass meds when there are 20 inmates at the door because u can't close or lock the sliders. They bust holes in the walls. Bust out the windows. The sheriff does try to have it fixed but literally the

QCCSUPP_000115

day after its repaired it's broken again. They are causing fires in the jail. Smoking, doing drugs, and much worse. We constantly send people to the ER from physical altercations ATLEAST monthly. And they are getting worse i.e., broken jaws requiring surgery, broken orbitals causing reconstructive surgery, punctured lungs, and most recently death! And a lot of that falls back to the officers not receiving support from their commanding supervisor when enforcing the rules due to stressed emphasis on threats of law suits and officers not being backed when doing write ups that they don't even do them anymore because they go no where.
Instead we barter with the inmates by offering them e cigs outside McDonald food microwaves tvs and commissary in lue of good behavior rather than demanding and expecting it.

Even when I've had fluids thrown on me and my life threatened and harassed nothing was ever done. Officers are battered and assaulted with no consequences.
Literally every day that I work I pray I come home unharmed to my family because our medical staff is in fear of no support from the jail staff and with no backing.

It's like pulling teeth to get officers to pass meds. Sometimes they are busy because of being so under staffed and we wait hours literally to do things. There is a disconnect right now with medical and officers because they are so worried about getting sued for everything. The jail is over crowded and with all of the new laws of L6 felonies staying in county it's only getting worse which in turn causes the jail being understaffed to become worse. Nursing is also affected by this because we are still at 72 hrs a week and it's not enough. We struggle to get our job done in our hours allowed and adding in more inmates is only making it harder to accomplish our goals.

They have civilians who receive no jail training working in the main control room, recently our office was broken into

QCCSUPP_000116

and medication was stolen the entire events were on camera however they are not properly being monitored by the civilian in the control room. There is probably a lot that can and would be prevented if they would watch the cameras like they are supposed to and report fights, property damage, and other in house incidents to the jail staff however this too is hindered by numerous cameras being broke or covered up by inmates and not being repaired. A trained correctional officer would know what to look for and how to handle it should they see these things on camera.

In order to properly protect the safety of the medical staff, and the jail officers and jail itself. The correctional officers need to be in control at all times not the inmates. This breakdown greatly falls in the hands of who empowers each officer. They work every day along the side of us fearing that they will get in trouble or reprimanded for any decision they make should it be good or bad. This is not acceptable and could ultimately cause a great danger to medical staff as these are the people we turn to for protection. This protection cannot be provided if they are working in an unsafe environment with No support or backing from jail command staff.

When these concerns listed above have been addressed with the commander himself we were informed if we didn't feel safe in the jail we shouldn't be working there. This was the also the answer to medical staffs question about having an officer escort us during administration of inmate medical care.

Medical staff does not receive training in any fighting techniques not do we carry any non lethal weapon on our person. We shouldn't have to even question the fact of having No protection.

QCCSUPP_000117

Everything listed above ultimately falls back to lack of support, poor facilities, and no backing from jail command staff. Prime example as to why we have lost 5 great full time officers in the last month. Maybe we should talk to them about why they left.

Tara Westermen