## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DOUGLAS J. GOSSER As Personal Representative of the Estate of Brian Lee Gosser, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 1:17-cv-03257-TWP-MPB |
| RICHARD A. MCCORKLE Individually and in his official capacity as Sheriff of Henry County, BRENT GRIDER Individually and in his official capacity as Jail Commander of the Henry County Jail, QUALITY CORRECTIONAL CARE, CHRISTOPHER STEPHENSON P.A., TARA WESTERMAN R.N., DENETTE LEWARK R.N., | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |
| RICHARD A. MCCORKLE Individually and in his official capacity as Sheriff of Henry County, QUALITY CORRECTIONAL CARE LLC, | ) ) ) ) | |
| Cross Claimants, | ) ) | |
| v. | ) ) | |
| QUALITY CORRECTIONAL CARE LLC, RICHARD A. MCCORKLE Individually and in his official capacity as Sheriff of Henry County, | ) ) ) | |
| Cross Defendants. | ) | |

## ENTRY ON PENDING MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on separate Motions for Partial Summary Judgment filed
by the Defendants in this action. On April 1, 2019, Defendants Richard A. McCorkle ("Sheriff
McCorkle") and Jail Commander Brent Grider ("Commander Grider") (together, the "Henry
County Defendants") filed their Motion for Partial Summary Judgment, (Filing No. 92). That same

date, Defendants Quality Correctional Care, L.L.C. ("QCC"); Physician Assistant Christopher Stephenson, ("Stephenson"); Tara Westerman, R.N. ("Westerman"); and Dennette Lewark, R.N. ("Lewark") (together, the "QCC Defendants") filed their Motion for Summary Judgment, ([Filing No. 96](#)). Plaintiff, Douglas J. Gosser ("Douglas Gosser")initiated this action as personal representative of the estate of his son, Brian Lee Gosser ("Gosser"), who sustained fatal injuries while being housed as a pretrial detainee in the Henry County Jail (the "Jail"). ([Filing No. 1](#).)

The Complaint alleges failure to protect and denial of medical care in violation of 42 U.S.C. § 1983, as well as negligence and wrongful death in violation of Indiana law. *Id.* at 12. The Henry County Defendants move for summary judgment on the § 1983 claims and ask the Court to dismiss the state law claims without prejudice. ([Filing No. 92](#).) The QCC Defendants initially moved for summary judgment on all claims, contending no material facts were in dispute ([Filing No. 96](#)), but have since withdrawn their motion as to the state law negligence claims ([Filing No. 101](#)), converting their original motion into one for partial summary judgment. For the following reasons, the Court **grants in part and denies in part** the Henry County Defendants' Motion and **denies** the QCC Defendants' Motion.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Douglas Gosser as the non-moving party.[1] *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[1] Due to the large number of disputed facts in this case, the Court points out certain disputes in this background section. On summary judgment, the Court reviews the record in the light most favorable to the Plaintiff as the non-moving party and draws all reasonable inferences in his favor.

## A.  <u>Arrest and Booking</u>

On February 17, 2016, Gosser was arrested in Henry County, Indiana for operating a vehicle while intoxicated.  ([Filing No. 93-1 at 8](), 10.)  Before being transported to the Jail, Gosser was examined at Henry County Hospital and received medical clearance to be booked into jail. ([Filing No. 97-2 at 1]().)  When initially determining where to house Gosser during his pretrial detention, some staff members at the Jail were aware that his father, Douglas Gosser, had been a sheriff in Rush County for many years.[2] ([Filing No. 106-2 at 2](); [Filing No. 106-8 at 6]().) Despite his father's profession, which, if discovered, might make Gosser vulnerable to the hostility of other inmates, Jail staff chose to house him in medium security detention with convicted felons. ([Filing No. 106-14 at 13]().)

The Jail had a reputation among those who worked there for being dangerous and overcrowded.  Teresa Weesner, a former officer who worked in the Jail testified that it was "absolutely not" safe for jail officers and that she felt her life was threatened.  ([Filing No. 106-7 at 2]().)  Commander Grider admits that the Jail struggled with "overcrowding" and altercations between inmates.  ([Filing No. 106-5 at 3]().)  Medical staff who worked in the Jail offered a more damning indictment of its conditions.  Nurse Westerman said that there was "NO discipline in the jail" and that medical professionals "constantly send people to the ER from physical altercations". ([Filing No. 106-3 at 11-12]()) (emphasis in original).  "And they are getting worse i.e., broken jaws requiring surgery, broken orbitals causing reconstructive surgery, punctured lungs, and most recently death", Nurse Westerman wrote in an e-mail to Jail staff, referencing Gosser's death.  *Id.*

---

[2] The Henry County Defendants dispute this evidence, stating in their summary judgment brief that Douglas Gosser's former occupation "was not known to the booking deputy or others at the jail, because Doug Gosser had been sheriff in the 1990's [sic] in a neighboring county." ([Filing No. 94 at 2]().)  They do not cite any designated evidence supporting the claim that no one at the Jail knew Douglas Gosser had been a sheriff.

at 12.  Nurse Lewark described the Jail as "crazy" and "rough," saying of the inmates, "[t]hey have no structure and no discipline."  (Filing No. 106-4 at 19.)

**B.**     **Initial Incarceration through First Medical Attention**

Gosser was initially housed in cell block B.  (Filing No. 106-14 at 31.)  He first submitted a medical request on February 19, 2016, two days after being booked into the Jail.  (Filing No. 97-2 at 12.)  He asked to be seen by a doctor or nurse to have prescriptions filled for Librium for alcohol withdrawal symptoms and Prozac for anxiety, but he was not seen by a medical professional.  *Id.*

Two days later, on February 21, 2016, Gosser was assaulted by an inmate in cell block B after that inmate erroneously concluded Gosser was a child molester.  (Filing No. 106-14 at 31.)  The assault consisted of a "punch to Brian Gosser's head area and Brian Gosser [falling] to the floor."  *Id.*  That same day Gosser submitted a second medical request form requesting that he be seen by a doctor or nurse for a possible concussion, saying "I cannot sleep, I am getting ill, I hit my head severely."  (Filing No. 97-2 at 14.)  At 12:55 A.M. on February 22, 2016, Gosser was placed in the drunk tank so that he could be physically observed due to a "head injury/face (fight)."  (Filing No. 106-14 at 8.)  No doctor or nurse examined Gosser around this time.  *Id.* at 26-27.

Due to the altercation in cell block B, Jail staff determined Gosser should be moved to another block, and at 9:45 A.M. on February 22, 2016, he was transferred to cell block F.  (*Id.* at 31; Filing No. 106-2 at 2.)  Commander Grider approved this transfer after the fact.  (Filing No. 106-2 at 2.)  The next day, February 23, 2016, Gosser was beaten by several other inmates in cell block F.  (Filing No. 106-14 at 31-32.)  Later that day, one of the inmates who committed the assault divulged to his girlfriend during a telephone call that Gosser had revealed that his father was a sheriff and as a result he had taken a "hard fall" in the shower.  *Id.*  Gosser later spoke to his

own girlfriend over the telephone and asked her to arrange bail for him, stating that he did not know if he would make it to Thursday—when he was scheduled to visit with his mother—because he feared further beatings. *Id.* at 33.

The evidence is disputed as to whether Gosser received medical attention the morning of February 23, 2016. (Filing No. 98 at 4-5; Filing No. 108 at 18.) The QCC Defendants cite a "Medical Progress Note" that indicates Westerman evaluated Gosser at 9:00 A.M. and consulted with Stephenson, who prescribed Prozac. (Filing No. 97-2 at 16.) Plaintiff contends in his summary judgment brief that "[a] jury may determine that, in an attempt to cover up the weeklong delay in attending to [Gosser] (from his booking on February 17 until February 25), Westerman fabricated the Medical Progress Note with the date '2-24-16,' but later predated and signed it '2-23-16.'" (Filing No. 108 at 18.) The date field at the top of the note is dated "2-24-16" with the "24" crossed out. (Filing No. 97-2 at 16.) Above the crossed out "24" Westerman wrote "23" and initialed. *Id.* At the bottom of the note, Westerman signed and dated "2-23-16." *Id.*

Examining the other evidence in the record only adds more confusion to the issue. When asked at her deposition when she first interacted with Gosser, Westerman said she "remember[ed] seeing him when [she] was passing meds one day for dental pain." (Filing No. 106-3 at 2.) That visit occurred on February 25, not February 23, 2016. (Filing No. 97-2 at 17.) When looking at the medical paperwork, Westerman testified that the first time she saw Gosser was on February 23, 2016. (Filing No. 123-1 at 4.) Stephenson also offered conflicting testimony. He testified that March 2, 2016 was the only time he ever saw Gosser. (Filing No. 106-6 at 3.) When presented with the Medical Progress Note that says he "visualized" Gosser on February 23, 2016, Stephenson said "usually I would have signed if I saw [the patient] right then," but he did not sign this specific

note.[3]  (Filing No. 123-2 at 5.)  By way of explaining why he had not signed that specific note, Stephenson said, "I don't know if I was on my way out or why I would have visualized that." *Id.* Lastly, the disputed note does not have a "provider signature," although a different Medical Progress Note in Gosser's medical records for an assessment on February 27, 2016 does have a "provider signature".  (Filing No. 97-2 at 20.)

Plaintiff asserts that the first time Gosser received any meaningful medical attention for his head injuries was at 9:00 A.M. on February 25, 2016, after he submitted his February 24, 2016 sick call saying he had dental pain.  (Filing No. 108 at 19.)  There is evidence in the record that supports this version of events as well.  Plaintiff cites Westerman's deposition testimony that the first time she recalls interacting with Gosser was when he asked to see the dentist because "he hit his mouth on the shower wall."  (Filing No. 106-3 at 2.)  Additionally, Gosser's medical records reveal that he began receiving Fluoxetine (Prozac) on February 25, 2016, the day he contends he was first examined.  (Filing No. 97-2 at 47.)

The QCC Defendants also assert that "[o]n February 26, 2016, Gosser was evaluated by Lewark in response to tooth pain and rib pain from slipping 'on wet floor.'"  (Filing No. 97-7 at 4.)  The only evidence supporting this assertion is the affidavit of QCC Defendants' medical expert Benjamin Loveridge, M.D. (Filing No. 97-7 at 2.)  The QCC Defendants also cite a "Sick Call & Medical Attention Request Form" that Gosser submitted on February 26, 2016, but that document only shows that Gosser asked to be seen by a doctor and dentist for rib and tooth pain.  (Filing No. 97-2 at 18.)  The medical staffer who reviewed that form marked in the "results of request" field that it was a "[d]uplicate request."  *Id.*  In her deposition, Lewark testified that she marked the form as a duplicate because Gosser had already spoken to Westerman that day.  (Filing No. 106-4

---

[3] The note indicates that Stephenson gave a verbal order to prescribe Prozac. (Filing No. 97-2 at 16.)

at 2-3.)  When asked, "[s]o did you do anything relative to this particular request on February 26th"; Lewark replied, "No."  *Id.* at 3.

## C.    **Further Beatings in F Block**

Plaintiff contends that on February 26, 2016, Gosser was assaulted three separate times in cell block F, primarily by the same three inmates.  (Filing No. 108 at 19-20; Filing No. 106-14 at 33-35.)  Medical records indicate:

> [t]he final incident was the most severe.  He was attacked by 3 other inmates. One held him down, while the others beat him. He was punched repeatedly in the head and face using bare fists. He was kicked and kneed in the back, chest, and ribs. He did lose consciousness during the incident.

(Filing No. 97-2 at 23).  Gosser notified correctional officers via a handwritten sign that he needed help.  At approximately 8:07 P.M. on February 26, 2016, officers removed Gosser from cell block F and placed him in the drunk tank for observation.  (Filing No. 106-14 at 35.)  Gosser reported to officers that he needed to go to the hospital, but Clark Lecher ("Lecher"), the officer who transported him out of cell block F, refused that request, saying in his deposition that "we've been drilled time and time again that me making that decision [to send a detainee to the hospital] would result in a nice lengthy conversation and discussion that I was a correctional officer, not a nurse or doctor." (Filing No. 106-9 at 6-7.) Thus, Gosser did not receive any medical treatment that night despite his complaints of pain and obvious swelling in his face.

The following morning, February 27, 2016, at 9:52 A.M., Jail staff moved Gosser from the drunk tank to cell block G after consulting with Commander Grider.  (Filing No. 106-13 at 43; Filing No. 106-2 at 4.)  He was not offered medical treatment at that time.  Instead, approximately two hours later, his severe injuries caught the attention of Lewark, who was distributing medication on cell block G but had not been notified of Gosser's injuries.  (Filing No. 97-2 at 20; Filing No. 106-4 at 3.)  Gosser reported pain everywhere due to an altercation the previous night.  (Filing No.

97-2 at 20.)  Lewark recorded that Gosser had bilateral black eyes, a swollen nose, difficulty breathing, a "popping noise" in his lower right lung, and general pain everywhere.  *Id.*

**D.**     **February 27, 2016 Emergency Room Visit**

After Lewark examined him at approximately noon on February 27, 2016, Gosser was transported to the Henry County Hospital emergency room for evaluation of his injuries.  (Filing No. 106-13 at 23-24.)  A medical examination and x-ray revealed that Gosser sustained a broken nose, a fracture to his left eye, a concussion, and two broken ribs.  *Id.*  After approximately three hours in the emergency room, Gosser was discharged.  (Filing No. 97-7 at 4.)  The "Follow Up Care" section on his discharge packet said, "Patient needs to be monitored for the next 24 hours for signs of head injury, including, but not limited to, somnolence, confusion, worsening headache, vomiting.  He should be rechecked by a physician within 48 hours."  (Filing No. 106-13 at 31.)

**E.**     **Return to Henry County Jail**

Approximately 3:30 P.M. on February 27, 2016, Gosser was returned to the Jail. The QCC Defendants assert there is no evidence that QCC staff received Gosser's discharge packet until two days later, on February 29, 2016.  (Filing No. 98 at 7.)  But the discharge packet itself indicates that it was printed at 3:31 P.M. on February 27, 2016, (Filing No. 97-2 at 28), and Lewark testified that she had received and reviewed the discharge paperwork by February 28, 2016.  (Filing No. 106-4 at 8.)  Upon his return from the hospital, Commander Grider placed Gosser in cell block G. (Filing No. 93-3 at 6.)  Gosser was not assaulted or harmed by any inmates after he returned from the hospital on February 27, 2016.

His condition deteriorated nonetheless, and in the early morning hours of February 28, 2016, he complained of sweating and vomiting.  (Filing No. 106-13 at 27.) A Jail officer removed Gosser from his cell and took his vitals.  *Id.*, Filing No. 97-2 at 26.  The officer listed his blood

pressure as 136/84, his temperature at 98.2 degrees, his pulse at 107, and his respiration level at 96%. (Filing No. 97-2 at 26.) He also noted that Gosser had discomfort in his upper stomach or chest area. *Id.* Jail officers placed Gosser in the drunk tank for observation and notified the nursing staff of his complaints. (Filing No. 106-13 at 23.)

The parties disagree about Gosser's interaction with medical staff on February 28, 2016. Lewark wrote a "Progress Note" on that day saying Gosser had returned from the emergency room with "multiple rib fractures, and fractured septum [and] [complaints of pain.]" (Filing No. 97-2 at 35.) The note also says Lewark notified the physician's assistant, Stephenson. *Id.* The note records that Lewark prescribed ibuprofen but there is no record of Gosser's vitals that would indicate a thorough examination took place. *Id.*

The parties also dispute when the QCC Defendants requested Gosser's physician's notes from the Henry County Hospital. The QCC Defendants allege Westerman contacted the emergency room to request the notes on February 29, 2016, citing a handwritten notation on Gosser's discharge packet that read, "Contacted ER waiting for ER physician notes 2-29-16". (Filing No. 97-2 at 28.) Plaintiff contends this notation may have been written after February 29, 2016. (Filing No. 108 at 25.) He points out that Westerman testified that to obtain the physician's notes, the QCC staff must fax a release of information form to the hospital. (Filing No. 106-3 at 4.) Although that release of information should be included in the patient's medical records, Gosser's records do not contain one. *Id.* at 10.

From the time he was returned from Henry County Hospital on February 27, 2016, Gosser asked to see a nurse every day. (Filing No. 106-4 at 17-18.) Gosser told the nursing staff his ibuprofen subscription was an underdose. (Filing No. 107 at 16:40-17:15.) While the nurses were passing out medication, he told them that he did not feel right and he was having trouble breathing.

([Filing No. 106-8 at 17](#).)  During this time, Gosser was not eating and was "puking all the time."
([Filing No. 106-13 at 51](#).)  According to one of Gosser's blockmates, one nurse was "very mean
to him" and "[told] him basically to just walk it off."  *Id.*

Gosser was not seen by a qualified medical provider until March 2, 2016—four days after
he was returned from the hospital.  ([Filing No. 97-2 at 37](#).)  Stephenson recorded that Gosser had
pain in his left upper ribs.  *Id.*  Stephenson testified that either Westerman or Lewark measured
Gosser's vital signs at that examination, but no evidence in the record supports that statement.
([Filing No. 106-6 at 3](#).)  He described this March 2, 2016 examination as a follow-up from Gosser's
emergency room visit on February 27, 2016, saying, "[w]e get them in from follow-up from the
E.R., just to eyeball them and make sure they are okay." *Id.* at 7. P.A. Stephenson continued
ibuprofen and Tylenol and prescribed prednisone.  ([Filing No. 97-2 at 37](#).)

On March 9, 2016, five days after Gosser passed away, Stephenson added a "late entry" to
the Progress Note from his March 2, 2016 examination of Gosser.  *Id.* at 38.  This entry said that
Gosser was having left rib pain but that "no bruising or redness was identified."  *Id.*  He stated the
examination occurred at about 10:00 P.M. on March 2, 2016.  *Id.*  Stephenson also stated, "I did
not have records or reports on the injuries sustained on the 2-27-16 date. I only had diagnosis
papers from E.R." *Id.*

**F.** **March 3, 2016**

The parties disagree about the extent of Gosser's interaction with medical staff and his
condition on March 3, 2016.  That morning, as Westerman was passing out medication, Gosser
told her that he was vomiting and had been in pain.  Westerman observed that Gosser had spit, but
not vomited, into a cup.  ([Filing No. 106-3 at 6](#).)  She did not measure his vitals at that time (*Id.*),

10

but she did provide him with ice chips that he could consume instead of liquid. (Filing No. 97-2 at 44.)

Later that day, Lewark was summoned by a Jail officer to take a look at Gosser, who was still complaining of pain and vomiting. (Filing No. 106-10 at 1-2.) Lewark's Progress Note stated that Gosser was pale and taking short breaths. (Filing No. 97-2 at 39.) She measured his vital signs, which showed he had a blood pressure of 98/70, a temperature of 97.5, and an oxygen saturation level of 91%. *Id.* Stephenson testified that 91% oxygen saturation "means it is lower than it should be." (Filing No. 106-6 at 5.) Lewark used her stethoscope to listen to Gosser's breathing, noting that his lung sounds were diminished and that she heard a "popping noise" below his right nipple. (Filing No. 97-2 at 39; Filing No. 106-4 at 12.) Gosser told her the pain had started on his left side but had spread to his right side as well. *Id.* Rather than sending Gosser back to the emergency room, Lewark administered albuterol, which raised Gosser's oxygen saturation to 97%. (Filing No. 97-2 at 39.) She also prescribed Zofran to alleviate his nausea. *Id.* Gosser told Lewark his chest was tight and he had not slept in days. *Id.*

Sometime after that examination, on the afternoon of March 3, 2016, Lewark ordered an x-ray of Gosser's chest area to determine if his lung was punctured. (Filing No. 106-4 at 14.) Lewark left work at 7:30 P.M. and told Lecher that "Inmate Brian Gosser had an X-ray scheduled that evening and that if no one had arrived by 8:00 pm to call her and inform her." (Filing No. 106-13 at 30.) By 8:20 P.M., no x-ray technician had arrived. *Id.* Lecher checked on Gosser, who was still lying in bed and was vomiting. *Id.* Lecher then called Lewark, who told him to put Gosser in the drunk tank or recreation yard for observation and to call Westerman with any updates in regard to the results of the x-ray. *Id.*

An x-ray technician eventually arrived, and an x-ray of Gosser's chest was completed around 9:05 P.M. on March 3, 2016. (Filing No. 97-2 at 41.) The x-ray revealed a "slight infiltrate in the right lung base." *Id.* at 43. Lecher relayed these results to Westerman over the telephone or by email. (Filing No. 106-9 at 11.) Westerman spoke with Stephenson, who prescribed Zithromax, an anti-pneumonia medication, to start the next morning. (Filing No. 106-6 at 2; Filing No. 97-2 at 44.) The medical staff did not make any effort to examine Gosser in person when it learned of this "slight infiltrate" that had been revealed by the x-ray.

Approximately ten minutes after he had sent Westerman a picture of the x-ray results, Lecher noticed that Gosser was vomiting in the drunk tank. (Filing No. 106-14 at 4-5.) He called Westerman back and informed her that Gosser had gotten sick and did not look well . *Id.* Westerman hung up the telephone, consulted with Stephenson, and two minutes later called Lecher back and told him to transport Gosser to the hospital immediately. *Id.* Gosser was sent to Henry County Hospital at approximately 10:30 P.M. on March 3, 2016. *Id.* at 5.

## G. <u>Final Hospital Visit and Death</u>

At the hospital, a doctor administered an x-ray and a CT scan on Gosser. *Id.* at 6. Gosser was diagnosed with sepsis, pleural effusion, acute kidney failure, and an unspecified injury to his liver. (Filing No. 106-16 at 1.) The Henry County Hospital had to send Gosser to Indianapolis, Indiana because it was not equipped to treat him. (Filing No. 106-14 at 6.) On orders from Commander Grider, Lecher, who had transported Gosser to the emergency room, told him that after he was treated in Indianapolis he would need to return to the Jail to "finish his sentence" or he would be charged with failure to return. *Id.* Gosser was transferred to St. Vincent Hospital in Indianapolis. He passed away in the early morning hours of March 4, 2016.

## H. **Procedural History**

On September 13, 2017, Douglas Gosser, on behalf of the Estate of Brian Gosser, filed the Complaint in this matter alleging Eighth Amendment violations and negligence and wrongful death under Indiana law. (Filing No. 1.) The named Defendants were law enforcement officers in Henry County in both their official and individual capacities as well as QCC and its individual employees that Gosser interacted with between February 27 and March 4, 2016. Through the course of this litigation, the Defendants and claims have been whittled down to leave the following claims:

> (1) Against the QCC Defendants – Eighth Amendment violation under 42 U.S.C. §1983; negligence under Indiana law; and wrongful death under Indiana law
>
> (2) Against Richard A. McCorkle in his official capacity as sheriff of Henry County[4] - Eighth Amendment violation under 42 U.S.C. §1983; negligence under Indiana law; and wrongful death under Indiana law
>
> (3) Against Brent Grider, individually and in his official capacity as Jail Commander of the Henry County Jail - Eighth Amendment violation under 42 U.S.C. §1983; negligence under Indiana law; and wrongful death under Indiana law.

The QCC Defendants moved for summary judgment as to all claims against each QCC Defendant (Filing No. 96), but later withdrew their motion as to the state law negligence claims against each QCC Defendant. (Filing No. 100; Filing No. 101.) The Henry County Defendants move for summary judgment as to Plaintiff's Constitutional claims against McCorkle and Commander Grider in their official capacities, and against Commander Grider in his individual capacity. (Filing No. 92.) Assuming the Court grants that Motion, the Henry County Defendants ask the Court to dismiss the state law claims against them without prejudice. *Id.*

---

[4] Plaintiff initially brought claims against McCorkle in his individual capacity as well but notified the Court in his summary judgment response brief that he is abandoning those claims. (Filing No. 108 at 50.)

## II.    <u>LEGAL STANDARD</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). A disputed fact must be "material," which means that it might affect the outcome of the case under the applicable substantive law. *Liberty Lobby*, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts do not preclude summary judgment. *Id.* A genuine dispute of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

### III. <u>DISCUSSION</u>

The Henry County Defendants and the QCC Defendants have filed motions for partial summary judgment. The Henry County Defendants assert that the claims against them in their official capacities lack merit because Plaintiff has not identified an unconstitutional policy that led to Gosser's death. (Filing No. 92.) They also assert that Commander Grider did not have sufficient personal involvement in Gosser's death to be liable on the claim against him in his individual capacity. *Id.* The QCC Defendants argue there are no disputed issues of fact material to Plaintiff's medical indifference claim. (Filing No. 98 at 13.) The Court will first address Plaintiff's federal claims, then move on to his state claims arising under Indiana law.

### A. <u>§ 1983 Claims</u>

Gosser was a pretrial detainee, and thus his rights arise out of the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishment clause. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). Because Gosser had not been convicted of any crime, constitutionally, he could not be punished at all, regardless of whether that punishment is cruel or unusual. *Id.* (citing *Kinglsey v. Hendrickson*, 135 S.Ct. 2466, 2475 (2015); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). This distinction lowers the standard for liability from one of *subjective* reasonableness or deliberate indifference to one of *objective* reasonableness.[5] *Id.* at 351. Having established that backdrop, the Seventh Circuit offers the following standards for federal claims brought by the Plaintiff.

For his failure to protect claim, brought against the Henry County Defendants, Plaintiff must show that a defendant acted purposefully, knowingly or recklessly regarding Gosser's risk of

---

[5] The Court uses the objective-reasonableness standard for both Plaintiff's "failure to protect" claims against the Henry County Defendants, *Miranda*, 900 F.3d at 352, and his "denial of medical care" claims against all Defendants. *McCann v. Ogle Cnty., Ill.*, 909 F.3d 881 (7th Cir. 2018).

assault, and that their conduct was objectively unreasonable. *See Stidmire v. Watson*, 2018 WL 4680666 at *4 (S.D. Ill. Sept. 28, 2018). In other words, for this claim to survive summary judgment, the Court must be convinced that a reasonable jury could find that the Henry County Defendants acted purposefully, knowingly or recklessly regarding Gosser's risk of assault, and that their conduct was objectively unreasonable.

The standard for Plaintiff's denial of medical care claim—brought against all Defendants— follows the same two-step framework. The Court first "asks whether the [defendants] acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's case]." *McCann*, 909 F.3d at 886. A showing of negligence or even gross negligence will not suffice. *Id.* (citation omitted). At the second step, the Court asks "whether the challenged conduct was objectively reasonable." *Id.* (citing *Miranda*, 900 F.3d at 354). Thus, for Plaintiff's medical claims to survive summary judgment, the Court must be convinced that a reasonable jury could determine that the Defendants acted purposefully, knowingly, or recklessly with regards to Gosser's medical treatment, and that their conduct was objectively unreasonable. Both standards require the Court to "focus on the totality of the facts and circumstances" the Defendants' faced and to "gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.*

The Court will address the federal claims against the Henry County Defendants first, then move to the federal claims against the QCC Defendants.

1.  **Henry County Defendants**

Plaintiff asserts two separate theories of liability under § 1983 with regards to the Henry County Defendants. First, he argues they violated Gosser's Fourteenth Amendment rights by failing to adequately protect him from the assaults he suffered at the hands of other inmates. (Filing

No. 108 at 50-53.)  Second, he argues the medical care offered in the Jail and overseen by Commander Grider did not meet the Fourteenth Amendment's standards. *Id.* at 53-55.  He asserts these theories against both Henry County Defendants in their official capacities and against Commander Grider in his individual capacity.

### a)     Official Capacity Claims

As both parties recognize in their briefing, a claim against McCorkle and Commander Grider in their official capacities is in effect a claim against the municipality.  To hold Defendants liable on such a claim, the Plaintiff must demonstrate that their "official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind [the] constitutional injury." *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016), citing *City of Canton v. Harris*, 489 U.S. 378, 379 (1989).  "An unconstitutional policy can include both implicit policies as well as a gap in expressed policies." *Id.* (quotations omitted).

### i. Failure to Protect

As for the failure to protect claim, Plaintiff contends that "there is evidence that the policy instituted by the Jail of sending non-violent detainees like [Gosser] into the violent chaos of the Jail with no safeguards for his protection violated [Gosser's] rights against being punished while he awaited trial."  (Filing No. 108 at 56.)  According to the Henry County Sheriff's Office Jail Division Policies and Procedures, an intake screening when a new inmate arrived at the jail was supposed to sort that inmate into "maximum, medium, or minimum [security] housing."  (Filing No. 106-14 at 1 (emphasis deleted).)  Here, Plaintiff argues the intake procedure was toothless because the same Policies and Procedures handbook allows "[i]nmates classified at the Minimum and Medium custody levels [to be] housed together" and "Medium and Maximum custody inmates [to be] housed together." *Id.* at 3.  Minimum and maximum security inmates were to be housed

separately "when space allows." *Id.* As a result of this policy, Plaintiff argues that Gosser, who was not convicted of a crime and had no history of violence, was housed with violent criminals, resulting in the foreseeable assaults that ultimately contributed to his death. (Filing No. 108 at 56-57.)

Regardless of the constitutionality of Henry County's classification policy, Plaintiff's claim cannot survive summary judgment because no evidence shows that the policy was the "moving force" behind Gosser's injuries. The evidence shows that the screener at the jail chose to classify Gosser as a medium security inmate. (Filing No. 106-14 at 13.) But nothing in the record indicates the security classification of the inmates who assaulted Gosser in cell blocks B and F. It is possible that each of the four inmates who assaulted Gosser were also medium security inmates, or even minimum security inmates, in which case the policy of intermingled housing was not the moving force behind the assaults.

The Court agrees with the Plaintiff that the Jail and its officers should have done many things differently, and if they had Gosser's death may well have been avoided. Perhaps the intake officer should have classified Gosser as a minimum security inmate, knowing he had not been convicted of a violent crime (or any crime) and that his father's occupation as a former sheriff might put him at risk of violence from other inmates. And maybe Commander Grider should have moved Gosser to cellblock G immediately after he was assaulted in cellblock B, rather than trying to house him in cellblock F where he sustained the most serious of the assaults. But those decisions are the failings of individual officers, not a result of the housing policy Plaintiff identifies. Because no evidence shows that a maximum security inmate assaulted Gosser, no reasonable jury could find that Henry County Defendants' policy of co-mingling medium and maximum security inmates was the "moving force" behind Gosser's injuries. Therefore, the Court **grants** the Henry County

Defendants' Motion for Summary Judgment as to Plaintiff's failure to protect claims brought against both Commander Grider and McCorkle in their official capacities.

ii. **Denial of Medical Care**

Plaintiff also alleges "there is evidence that the Jail had a gap in its policies to assure that detainees such as [Gosser] who were beaten were evaluated or treated for their injuries." ([Filing No. 108 at 58](#).) Plaintiff cites the many times between Gosser's arrival and at the Jail and his death that he requested medical care but was denied it by officers. Plaintiff relies on Lecher's testimony at his deposition that he and his fellow officers have "been drilled time and time again that me making that decision [to send a detainee to the hospital] would result in a nice lengthy conversation and discussion [with his superiors] that [he] was a correctional officer, not a nurse or doctor." ([Filing No. 106-9 at 6-7](#).) Because of this policy, Plaintiff alleges Gosser did not receive any medical attention after he was assaulted in cell block B but before he was moved to cell block F. ([Filing No. 108 at 59](#).) The Henry County Defendants do not dispute the seriousness of Gosser's medical need. Therefore, for this claim to survive summary judgment, the Court must be able to answer the three following questions in the affirmative: (1) did the Henry County Defendants have a policy (or gap in policy) that prevented jail officers from providing sufficient medical care when medical staff was not there? (2) was that policy (or lack thereof) objectively unreasonable? And (3) was that policy the "moving force" behind injuries Gosser sustained?

The evidence indicates there was a policy that prevented Jail officers from rendering adequate care. Plaintiff has designated evidence that the medical system at the Jail operated as follows: Two nurses would arrive in the morning, dispense medications, attend to sick calls, and be generally on hand for medical duties. The record does not make clear exactly when Stephenson

was at the Jail, but it suggests he was there far less often than the nurses.[6]  Evidence indicates the nurses leave in the late afternoon or early evening.[7]  Although medical staff seem to be reachable by telephone or e-mail, this system leaves a significant period of time when Jail officers are the only people present to attend to inmates' medical needs.

Adding to this policy, there is confusion in the Jail staff about how to render adequate medical care.  Evidence shows that when no medical staff is at the Jail, officers are called upon to make medical decisions.  For example, at approximately 8:00 P.M. on February 26, 2016, when Lecher removed Gosser from cell block F after he had sustained three assaults, Gosser told Lecher he needed to go to the hospital.  (Filing No. 106-9 at 6.)  Lecher denied that request, telling Gosser instead to fill out a sick call form.  *Id*.  He denied the request, despite severe and observable bruising and swelling on Gosser's face, because he had been told "time and time again" by his supervisors that it was the job of the medical staff, not the jail officers, to send an inmate to the hospital.  *Id*. at 6-7.  Lecher's job had a medical component when QCC staff was not at the Jail,[8] but he felt there was a ceiling to the amount of care he could give.  A reasonable jury could determine that Lecher was allowed to deny an inmate's request to go to the hospital, but not allowed to grant it.  This policy left inmates in the hands of Jail officers, rather than medical professionals, overnight and in the early morning, and those officers were constrained by their superiors as to the remedies they could offer inmates.  That is not adequate medical care.

---

[6] Stephenson testified that there was usually a nurse at the Jail when he was there, unless he was there late at night, to render emergency services.  (Filing No. 106-6 at 7.)  He also testified that he rotates among several jails.  *Id.*

[7] On the day of March 2, 2016, for example, Westerman left the Jail at 3:50 P.M. (Filing No. 106-3 at 5.)  On March 3, 2016, Lewark clocked out at 7:30 P.M. (Filing No. 106-4 at 11.)

[8] For example, Lecher recorded Gosser's vital signs on February 28, 2016 at 5:30 A.M. before either of the nurses had arrived for the day. (Filing No. 97-2 at 26.)

The Henry County Defendants argue that "Sheriff McCorkle fulfilled his duty [to provide adequate medical care] by contracting with licensed medical professionals employed by an outside vendor to provide care to inmates in the Henry County Jail seven days a week." ([Filing No. 94 at 17](#).)  The Court disagrees.  The fact that Henry County engaged a medical professional to provide medical care does not in itself meet the requirements of the Fourteenth Amendment.  The arrangement left holes in the schedule where those medical professionals were not available to give treatment to sick or injured inmates.  The Court does not suggest that Henry County must engage QCC's services 24-hours-a-day to comport with the Fourteenth Amendment, but it needed to give those people who were responsible for medical care—the jail officers—the freedom to provide it adequately.

Next, the Court must determine whether the Henry County Defendants' arrangement was objectively unreasonable.  Viewing the evidence in the light most favorable to the Plaintiff, the Court finds that a reasonable jury could determine that Henry County's medical care policy was objectively unreasonable.  Lecher's quote that he had been told by his supervisor not to send a detainee to the hospital goes beyond mere negligence.  It is a command that puts the health of detainees at risk during the hours when no medical staff is at the Jail.  Giving Jail officers some medical responsibilities—such as recording an inmate's vital signs—but limiting the care those officers are allowed to provide is objectively unreasonable.  There is evidence in the record indicating that this was Henry County's policy when it came to Gosser's medical care.

Moreover, a reasonable jury could determine that Henry County's medical care policy was the "moving force" behind Gosser's death.  Gosser complained to Lecher on February 26, 2016 that he needed to be hospitalized.  Lecher refused that request, based on a Henry County policy, and Gosser was ultimately sent to the hospital by QCC staff the following day. Furthermore, on

the evening of March 3, 2016, as Gosser's condition was deteriorating, no QCC staff was at the Jail to evaluate him. Lecher was responsible for monitoring Gosser, but, even after seeing him vomiting in the drunk tank, had no authority to send Gosser to the hospital. Instead, he had to call a nurse to relay both the x-ray results and Gosser's condition. That nurse then had to call Stephenson to get permission to send Gosser to the hospital. A reasonable jury could find that this substandard medical care and delay in hospitalization directly contributed to Gosser's death.

The Court concludes that a reasonable jury could determine the Henry County jail had a policy that prevented officers from rendering adequate medical care, that policy was objectively unreasonable, and that it was the moving force behind Gosser's death. For that reason, the Henry County Defendants' Motion for Summary Judgment is **denied** as to Plaintiff's denial of medical care claim.

### b)      <u>Individual Capacity Claims</u>

Plaintiff brings the same two § 1983 claims against Commander Grider in his individual capacity. To be liable in his individual capacity, Commander Grider must have known about the unconstitutional conduct and facilitated it, approved it, condoned it, or turned a blind eye for fear of what he might have seen. *See Morfin v. City of East Chi.*, 349 F.3d 989, 1001 (7th Cir. 2003); *see also Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003). The Henry County Defendants ask for summary judgment on Plaintiff's individual capacity claims, arguing Commander Grider "did not have enough knowledge to form indifference." ([Filing No. 94 at 21](#).)

Plaintiff argues that Commander Grider's failure to protect Gosser from assaults at the Jail violated Gosser's Fourteenth Amendment rights. Plaintiff cites to an array of statements from officers, medical providers, and inmates that make clear that, in general, the Jail was a dangerous and overcrowded place, inmates assaulted one another regularly, and discipline was lacking.

([Filing No. 108 at 51-52](#).)   He also cites two statements made by Commander Grider himself, which Plaintiff contends reveal Commander Grider's knowledge that he failed to protect Gosser. First, after Gosser was returned from the hospital on February 27, 2016, Commander Grider wrote to Gosser's father to say that he had secured Gosser "into a block where I thought he would be safe" and "[a]t this time, he is in a block where I feel he is safe as possible."  ([Filing No. 106-13 at 1](#).) Plaintiff reads this note to indicate that, prior to his assaults, Commander Grider had placed Gosser in a block that Commander Grider knew was unsafe.  Second, Plaintiff points out that, on March 3, 2016, as he was giving the okay for Gosser to be transferred to the hospital in Indianapolis, Commander Grider told Lecher that after he was treated he would need to return to the Jail to "finish his sentence."  ([Filing No. 106-14 at 6](#).)  Given that Gosser was not serving a sentence because he had not been convicted of a crime, Plaintiff deduces from this statement that Commander Grider was unaware that punishing Gosser in any way amounted to a Constitutional violation.

After examining the evidence in the record, the Court finds that no reasonable jury could determine that Commander Grider's supervision of Gosser was constitutionally deficient. Commander Grider had no reason to know that there was a specific threat of harm to Gosser's safety.  Gosser did not complain to Jail staff until after his last and most severe assault, when he made a sign indicating his desire to be moved from cell block F.  Contrary to Plaintiff's claims, no evidence indicates that Commander Grider was aware that other inmates had identified Gosser as the son of a sheriff.  And Gosser was not forthcoming with Jail officers, refusing even upon his unfortunate passing to reveal who assaulted him cell block F.[9]

---

[9] The Court's reiteration of this fact speaks only to Commander Grider's knowledge of a specific threat. It is an unfortunate reality of incarceration that inmates often feel it is in their best interest not to "snitch" on other inmates whom they might continue to encounter. Because Gosser understandably would not reveal the circumstances surrounding the assaults he suffered, it limited Commander Grider's knowledge of the risks he faced.

To prove a failure to protect claim, Plaintiff must provide evidence that the Defendant knew of a *specific* threat against the inmate's safety. *Velez v. Knight*, 2019 WL 5420456 at *2 (S.D. Ind. Oct. 21, 2019) (emphasis added). Although Plaintiff has shown it was well-known to Commander Grider and others that the Jail was a dangerous place where assaults frequently occurred, he has not provided evidence that Commander Grider knew of a specific threat to Gosser's safety. Because there is no evidence of a specific threat, no reasonable jury could hold Commander Grider liable for failure to protect in his individual capacity. Thus, the Henry County Defendants' Motion for Summary Judgment is **granted** as to Plaintiff's failure to protect claim against Commander Grider in his individual capacity.

Plaintiff also argues that Grider's role in Gosser's medical treatment at the Jail fell below the standards required by the Fourteenth Amendment. Plaintiff points out that after Gosser was first assaulted, in cell block B, Jail officers took him to the drunk tank but did not render any medical treatment. The injuries he sustained in the assaults he faced on February 26, 2016 in cell block F were also ignored by Commander Grider. Gosser only received treatment the following day, when a nurse happened to notice his injuries while she was passing out medication. Gosser was not immediately treated despite requests he made to Jail staff to go to the hospital.

The Court will assume that Commander Grider's failure to secure medical care for Gosser on the nights of his assaults was, at a minimum, reckless. Nevertheless, Plaintiff cannot succeed on his claim if Commander Grider's behavior was objectively reasonable. *McCann*, 909 F.3d at 886. Commander Grider relied on the Jail's medical professionals to provide medical care, and Seventh Circuit caselaw makes it clear that reliance negates a deliberate indifference claim. *Miranda*, 900 F.3d at 343 ("When detainees are under the care of medical experts, non-medical

---

or an attempt to blame him for the vicious assaults he faced. Because Gosser understandably would not reveal the circumstances surrounding the assaults he suffered, he limited Grider's knowledge of the risks he faced.

jail staff may generally trust the professionals to provide appropriate medical attention."). Although Commander Grider decided not to send Gosser to the emergency room on the night of February 26, 2016, Lewark observed him the following morning and decided to send him. Even if Commander Grider's actions on February 26, 2016 had constituted deliberate indifference, there is no evidence that this indifference contributed to Gosser's death, because Gosser received care from medical professionals in the interval. Because Commander Grider's actions were objectively reasonable, the Court **grants** the summary judgment as to Plaintiff's denial of medical care claim. Commander Grider, however, remains a defendant in his individual capacity on Plaintiff's state law claims.

### 2.    <u>QCC Defendants</u>

Plaintiff asserts the QCC Defendants violated Gosser's Fourteenth Amendment rights by failing to provide adequate medical care. The Court need not delve into the law on this claim because numerous disputes of material fact preclude summary judgment as to each QCC Defendant. As noted in Section II of this Entry, Plaintiff and the QCC Defendants disagree about whether Gosser received medical attention the morning of February 23, 2016. ([Filing No. 98 at 4-5](); [Filing No. 108 at 18]().) The QCC Defendants cite a "Medical Progress Note" that indicates Westerman evaluated Gosser at 9:00 A.M. and consulted with Stephenson, who prescribed Prozac. ([Filing No. 97-2 at 16]().) Plaintiff contends a reasonable jury could determine that this progress note was doctored or back-dated. The date field at the top of the note is dated "2-24-16" with the "24" crossed out and replaced with "23". ([Filing No. 97-2 at 16]().) When asked at her deposition when she first interacted with Gosser, Westerman said she "remember[ed] seeing him when [she] was passing meds one day for dental pain." ([Filing No. 106-3 at 2]().) That visit occurred on February 25, not February 23, 2016. ([Filing No. 97-2 at 17]().) When looking at the medical

paperwork, Westerman testified that the first time she saw Gosser was on February 23, 2016. (Filing No. 123-1 at 4.)

Stephenson also offered conflicting testimony. He testified that March 2, 2016 was the only time he ever saw Gosser. (Filing No. 106-6 at 3.) When presented with the Medical Progress Note that says he "visualized" Gosser on February 23, 2016, Stephenson said "usually I would have signed if I saw [the patient] right then," but he did not sign this specific note. (Filing No. 123-2 at 5.) By way of explaining why he had not signed that specific note, Stephenson said, "I don't know if I was on my way out or why I would have visualized that." *Id.* Lastly, the disputed note does not have a "provider signature," although a different Medical Progress Note in Gosser's medical records for an assessment on February 27, 2016 does have a "provider signature." (Filing No. 97-2 at 20.) There is evidence in the record to support each party's version of events. The Court will not weigh that evidence at the summary judgment stage.

That is just one of the many material factual disputes between Plaintiff and the QCC Defendants. Plaintiff asserts Gosser first received medical attention on February 25, 2016, while the QCC Defendants insist they rendered aid on February 23, 2016. Plaintiff argues the QCC Defendants saw Gosser's discharge packet when he returned from the emergency room on February 27, 2016; the QCC Defendants claim they did not see it until later. The parties dispute the extent of the medical care Gosser received at the Jail on both February 28 and March 3, 2016. They dispute when the QCC Defendants requested Gosser's physician's notes from the Henry County Hospital. Each of those disputes is material to Plaintiff's claim. Additionally, each party's position on each dispute is supported by evidence in the record, often because the QCC Defendants themselves offered conflicting testimony at their depositions.

Because of these material disputes of fact, the Court **denies** the QCC Defendants' Motion for Summary Judgment as to Plaintiff's § 1983 claims against them.

**B.**     **State Law Claims**

The Henry County Defendants do not ask for summary judgment on Plaintiff's state law claims. They merely ask the Court to dismiss the claims without prejudice as it disposes of the federal claims against the Henry County Defendants. Because one federal claim against the Henry County Defendants in their official capacities has survived the Motion for Summary Judgment, the Court **denies** this request. Plaintiff's state law claims against the Henry County Defendants remain for trial.

In their summary judgment brief, the QCC Defendants assert "[t]here is no evidence designated to support [Plaintiff's] claims for negligence." (Filing No. 98 at 14.) They later withdrew that portion of their summary judgment brief by motion to the Court. (Filing No. 100.) Neither filing mentioned Plaintiff's state law claim for wrongful death. Because the QCC Defendants did not raise Plaintiff's wrongful death claim in their summary judgment brief, they have waived their opportunity to move for summary judgment on that claim.

Therefore, all state law claims against all Defendants remain for trial.

### IV.     CONCLUSION

For the reasons stated above, the Court **GRANTS in part and DENIES in part** the Henry County Defendants' Motion for Summary Judgment (Filing No. 92). The Court **grants** summary judgment as to Plaintiff's failure to protect claims against all Henry County Defendants in both their individual and official capacities. The Court **grants** summary judgment as to Plaintiff's denial of medical care claim against Commander Grider in his individual capacity. Plaintiff's

denial of medical care claim against McCorkle and Commander Grider in their official capacities, as well as all of Plaintiff's state law claims of Negligence and Wrongful Death, **remain for trial.**

Additionally, the Court **DENIES** the QCC Defendants' Motion for Summary Judgment (Filing No. 96). Plaintiff's § 1983 claims and his state law claims of Negligence and Wrongful Death against the QCC Defendants **remain for trial.**

**SO ORDERED.**

Date: 3/16/2020

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Ronald E. Elberger
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
relberger@boselaw.com

Jeffrey B. Halbert
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jhalbert@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pzimmerly@boselaw.com

Brian M. Pierce
BRIAN M. PIERCE, ATTORNEY AT LAW
brianpiercelaw@aol.com

Caren L. Pollack
POLLACK LAW FIRM, P.C.
cpollack@pollacklawpc.com